UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAWKI AHMAD SHARIF OMAR, who is currently detained abroad at an unknown location in Türkiye,<br><br>Petitioner,<br><br>v.<br><br>MARKWAYN MULLIN, Secretary, U.S. Department of Homeland Security, 2801 Nebraska Avenue, NW Washington, DC 20528;<br><br>KASH PATEL, Director, Federal Bureau of Investigation, 935 Pennsylvania Avenue, NW, Washington, DC 20535;<br><br>DAVID CUMMINS, Administrator, Transportation Security Administration, 6595 Springfield Center Drive, Springfield, VA 22150;<br><br>STEVEN L. MCQUEEN, Director, FBI Threat Screening Center, 935 Pennsylvania Avenue, NW, Washington, DC 20535;<br><br>MARCO RUBIO, Secretary, U.S. Department of State, 2201 C Street, NW, Washington, DC 20520;<br><br>TODD BLANCHE, Acting Attorney General of the United States, 950 Pennsylvania Avenue, NW, Washington, DC 20530,<br><br>Respondents. | PETITION FOR A WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND EQUITABLE RELIEF<br>(Action in the Nature of Habeas Corpus under 28 U.S.C. §2241; Mandamus under 28 U.S.C. §1361; Administrative Procedure Act under 5 U.S.C. §702; Declaratory Judgment under 28 U.S.C. §2201; and Attorney's Fees under 28 U.S.C. §2412)<br><br><br>Case No.: _____ |

PETITION FOR A WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND EQUITABLE RELIEF

1.  Petitioner, Shawki Ahmad Sharif Omar, by and through his undersigned counsel, Dr. Curtis F.J. Doebbler, respectfully petitions this Honorable Court for a writ of habeas corpus

pursuant to 28 U.S.C. §2241 and moves for a temporary restraining order and preliminary injunction.

2. Petitioner is a United States citizen who is currently detained in a deportation center in Gaziantep, Türkiye. Petitioner has been a naturalized American citizen since the early 1980s and his entire immediate family unit, including his wife Sandra Omar, and his nine children, are American citizens.

3. On knowledge and belief, but without any official confirmation, Petitioner is currently detained in a deportation center in Gaziantep, Türkiye, with the cooperation or at the request of the United States government, which through its consular officials, has acknowledged it is in communication with Turkish authorities regarding Petitioner's detention. Petitioner is being held in the constructive custody of the United States, and his imminent deportation to an unknown destination—where he faces a real risk of torture—violates his fundamental constitutional rights. This Court has jurisdiction to issue the writ.

4. Respondents have deprived Petitioner of his liberty without affording him due process of law, guaranteed to all American citizens in the Fifth Amendment of the United States Constitution as well as other constitutional right established in the Fourth, Sixth, and potentially Eighth Amendments, granting American citizens the right to be secure against unreasonable searches and seizures, the right to a speedy trial, and the right to be free from cruel and unusual punishment.

5. Respondents have acted in violation of the Citizen Non-Detention Act, 18 U.S.C. §4001, by causing the arbitrary and indefinite detention in a foreign nation without charge of any crime.

6. Respondents have acted inconsistent with their international legal obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, which entered into force for the United States on November 20, 1994, and has remained in force since that time, as well as the domestic legislation implementing this treaty, namely the 18 U.S.C. §§2340–2340A (Torture Act), by acting together with the officials of foreign countries—including but not limited to Iraq, Türkiye, and Jordan—who on information and belief, have tortured Petitioner, may again torture him, or may threaten to subject Petitioner to torture again.

7. Respondents have acted inconsistent with their international legal obligations under International Covenant on Civil and Political Rights by arbitrarily depriving Petitioner of his

liberty without due process (article 9) and by denying him his right to return to his own country (article 12). Respondents may have also violated Article 7 of this treaty by using coercive methods to interrogate Petitioner. The Supremacy Clause of the U.S. Constitution, Article VI, Clause 2, which states that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." This treaty has as its main purpose—perhaps its sole purpose—the creation of individual rights as one of the most preeminent human rights treaties in the world, and has been ratified by the United States on June 8, 1992. *See* 138 Cong. Rec. S4781 (daily ed. Apr. 2, 1992) (Senate advice and consent to ratification of this treaty).

8. This emergency constitutional action is brought by a citizen of the United States to remedy an egregious and ongoing violation of his fundamental rights.

9. Petitioner seeks his release from arbitrary, indefinite, and unlawful detention by the Respondents acting together with their agents, his return to the United States, and a determination by this Court that his detention, treatment, including interrogation without charge by the U.S. government and through its agents is unlawful and unconstitutional.

## JURISDICTION AND VENUE

10. This Petition is filed pursuant to 28 U.S.C. §§2241, 2242 for Writs of Habeas Corpus, 28 U.S.C. §1361 for Mandamus relief, and 28 U.S.C.S. §§2201, 2202 for injunctive relief. *See National Conf. on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 42-43 (D.D.C. 2003) (stating the standard for mandatory injunctive relief).

11. This Court possesses subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §2241 (statutory authority to grant Writs of Habeas Corpus); 28 U.S.C. §1361 (mandamus to compel an officer of the United States); 5 U.S.C. §702 (the Administrative Procedure Act); and 28 U.S.C. §2201 (the Declaratory Judgment Act).

12. Statutory habeas corpus jurisdiction is properly invoked under 28 U.S.C. §2241(a) and (c)(3), which authorizes district courts to grant writs of habeas corpus to persons "in custody in violation of the Constitution or laws or treaties of the United States." The writ extends to United States citizens held overseas where the United States exercises de facto control over their detention. *Munaf v. Geren*, 553 U.S. 674, 680 (2008) (holding that "the habeas statute

extends to American citizens held overseas by American forces operating subject to an American chain of command"); *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (recognizing that "the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers").

13. The United States Supreme Court has squarely established that federal district courts possess jurisdiction to entertain habeas petitions filed on behalf of American citizens held overseas under the color of federal authority, even if they are outside the physical boundaries of any domestic judicial district. *See Munaf v. Geren*, 553 U.S. 674, 685–86 (2008). *Also see Harris v. Nelson*, 394 U.S. 286 (1969) "the power of inquiry on federal habeas corpus is plenary"; *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 807 (D.C. Cir. 1988) (en banc) (emphasizing that courts have given the writ broad reach. *Id*.

14. In instances where an American citizen is constructively restrained or detained abroad at the behest, directive, or operational control of the United States government, the proper respondents are the cabinet-level federal officials who maintain ultimate supervisory control over the watch-listing mechanisms. Jurisdiction is properly anchored in the District of Columbia because the ultimate custodians reside and operate within this judicial district. *See Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47–50, 57 (D.D.C. 2004) (holding that federal courts maintain habeas jurisdiction over a citizen constructively detained abroad when foreign officials or intermediaries act as the agents of or at the behest of the United States).

15. Although Petitioner was physically detained by Turkish authorities in Gaziantep, Türkiye, the evidence demonstrates that he is being held in the "constructive custody" of the United States. Turkish authorities have informed Petitioner that they are detaining him "at the request of the United States authorities." Declaration of Mustafa Simsek, para. 8 (attached as Exhibit A); Declaration of Curtis Doebbler, para. 12 (attached as Exhibit B). Under the constructive custody doctrine, a United States citizen held by a foreign state at the behest of the United States is considered to be in the custody of the United States for habeas purposes. *Abu Ali,* 350 F. Supp. 2d at 41 (holding that an individual detained in Saudi Arabia "could survive a motion to dismiss his habeas claim based on the theory of constructive custody" where he alleged detention "at the behest and ongoing supervision of the United States").

16. Venue is proper in this district under 28 U.S.C. §1391(e)(1) because Respondents are federal officials acting under color of federal law, and the challenged conduct is implemented by

agencies headquartered in the District of Columbia. The decisions to place Petitioner on the No Fly List, to request his detention by Turkish authorities, and to prevent his return to the United States were made by officials within this district.

## PARTIES

17. Petitioner Shawki Ahmad Sharif Omar is a naturalized citizen of the United States, born December 17, 1961, in Kuwait. He is currently detained by Turkish authorities in Gaziantep, Türkiye, at the request of the United States government. He holds a valid United States temporary passport, number 721078585, issued on April 2, 2026, by the United States Department of State.

18. Respondent Kash Patel is the Director of the Federal Bureau of Investigation and the Terrorist Screening Center, which maintains the Terrorist Screening Database—including the No Fly List—and is responsible for nominations to and removals from the list. He is sued in his official capacity.

19. Respondent Markwayne Mullin is the Secretary of the Department of Homeland Security, which oversees the Transportation Security Administration and the Secure Flight program, through which airline passengers are screened against the No Fly List. He is sued in his official capacity.

20. Respondent Ha Nguyen McNeill is the Senior Official Performing the Duties of the Administrator of the Transportation Security Administration, which administers the Secure Flight program and issues "Do Not Board" instructions to airlines. He is sued in his official capacity.

21. Respondent Marco Rubio is the Secretary of State, responsible for providing consular services to U.S. citizens abroad, including emergency repatriation assistance. He is sued in his official capacity.

## FACTS

### Petitioner's 22-Year Ordeal and Release

22. Petitioner is a 64-year-old U.S. citizen whose ordeal began when he was detained by United States military forces in Baghdad, Iraq, on October 29-30, 2004. He had traveled to Iraq to establish a construction business. He was held by U.S. forces without charge for nearly seven

years. During this period, he was subjected to torture by U.S. personnel, including being hung from the ceiling by his bound hands, beaten, and subjected to electric shock. His then-pregnant wife was also tortured in his presence, resulting in their child being born with disabilities.

23. In July or August 2011, Petitioner was transferred from U.S. custody to Iraqi authorities. He was convicted of illegal entry and later membership in an illegitimate group in proceedings that the United Nations Working Group on Arbitrary Detention later found to be unfair and arbitrary or in which the main witness against him admitted providing false testimony when he did not know and had never met or seen Petitioner. *See* UN Working Group on Arbitrary Detention, Opinion No. 05/2013 (Apr. 23, 2014), attached as Exhibit B, and Statement of Witness Against Mr. Omar in 2016 case (in Arabic and English), attached as Exhibit I.

24. When Petitioner was convicted of illegally entering the country in 2011, the United States government officials withheld his passport from the Iraqi Court, although it would have provided evidence of his legal entry. Similarly, when in 2016, when Petitioner was convicted of "membership in an illegitimate group" and sentenced to 15 years' imprisonment. The conviction was based almost entirely on the testimony of a single witness who had before the trial executed a sworn recantation of his testimony. The witness stated that he had been coerced by US authorities to testify falsely against Petitioner in exchange for his own release. A true and correct copy of the witness's recantation is attached hereto. *See* Statement of Witness Against Mr. Omar in 2016 case (in Arabic and English), attached as Exhibit I. The recantation states, in substance, that the witness did not know Petitioner, had never met him, and had been told by Iraqi authorities that he would be released if he testified against Petitioner. *Id*. The United States government is aware of the recantation and the coerced nature of Petitioner's conviction.

25. Petitioner was released from Iraqi custody on or around April 8, 2026 after an Iraqi judicial authority determined that he had served beyond the lawful term of his sentence due to a miscalculation. Upon his release, the United States Consulate in Erbil, Iraq, issued Petitioner a temporary U.S. passport, number 721078585, valid from April 2, 2026, to March 27, 2027 (by special designation). *See* Petitioner's U.S. Temporary Passport (Biodata Page), attached as Exhibit G.

26. Petitioner traveled to Istanbul, Türkiye on a commercial flight from Kirkuk, Iraq on or around April 11, 2026. He remained in Istanbul to recover and to meet family members. He made plans to return to the United States to be reunited with his wife and U.S. citizen children.

### The No Fly List and Denial of Boarding (June 13, 2026)

27. On May 26, 2026, Petitioner purchased a ticket on Turkish Airlines for flight TK187 from Istanbul International Airport (IST) to Washington Dulles International Airport (IAD), scheduled to depart at 7:40 a.m. on June 13, 2026. *See* Petitioner's Electronic Ticket and Flight Itinerary (Turkish Airlines Flight TK187, June 13, 2026), attached as Exhibit H.

28. Petitioner's wife Mrs. Sandra Omar informed the US authorities repeatedly that Petitioner intended to fly on flight TK187 on June 13, 2026. She received no reply indicating that this would be problematic. *See* Declaration of Sandra Omar, dated June 23, 2026, attached as Exhibit E.

29. At approximately 4:00 a.m. on June 13, 2026, Petitioner arrived at the Turkish Airlines check-in counter. He presented his valid U.S. temporary passport. A check-in counter manager informed Petitioner that the airline had received an email from United States authorities approximately ten hours earlier stating that Petitioner was not allowed to board the flight. The Turkish Airlines manager responsible for flight TK187 stated that the denial was the result of a communication for the United States government that placed Petitioner on a No Fly List. *See* Petitioner's Sworn Declaration, dated June 14, 2026, attached as Exhibit F.

30. Petitioner was not given any prior notice, explanation, or opportunity to contest the decision. *Id*. He has never been charged with any crime in the United States, never been convicted of any crime in the United States and has no criminal record in the United States. *Id*. Petitioner's placement on the No Fly List violates his Fifth Amendment right to procedural due process. By effectively preventing him from returning to the United States the US government's action infringes on a fundamental right of Petitioner.

### Petitioner's Detention by Turkish Authorities (June 22, 2026)

31. Stranded in Istanbul with limited resources, Petitioner traveled by bus on or around June 20, 2026, to Gaziantep, a city in southern Türkiye, because he had been informed that living expenses there were substantially lower than in Istanbul. When he arrived Petitioner met Mr.

Mustafa Simsek, a real estate agent, and sought his professional assistance in finding affordable accommodation in Gaziantep.

32. On June 22, 2026, while Petitioner and Mr. Simsek were walking together in the street in Gaziantep, they were intercepted by officers from Gaziantep Emniyet Müdürlüğü (Gaziantep Provincial Security Directorate). The officers detained Petitioner without stating a reason. When Mr. Simsek requested permission to accompany Petitioner, the officers refused. The officers took Mr. Simsek's telephone number and stated they would contact him later. Declaration of Mustafa Simsek, paras. 3-5, attached as Exhibit C.

33. On June 23, 2026, Petitioner called Mr. Simsek from detention. Petitioner stated that he had been detained by Turkish authorities who told him they were acting "on a request from the United States authorities" and that he had been taken to a deportation center. *Id.*, para. 8. Petitioner was crying and in bad condition. *Id.*

34. On June 23, 2026, Petitioner was also able to contact his wife via telephone. Although the telephone call was short Petitioner stated that he had been arrested by Turkish authorities who told him that they were acting on a request from the United States authorities. *See* Declaration of Sandra Omar, dated June 23, 2026, attached as Exhibit E.

### U.S. Government Custody and Control over Petitioner

35. On June 17, 2026, Petitioner signed a Power of Attorney specially authorizing the filing of a habeas application on his behalf. *See* Petitioner's Power of Attorney, attached as Exhibit J.

36. On June 17, 2026, at 10:52 CET, Petitioner's counsel emailed ACS_Istanbul@state.gov to the attention of Ms Sarah Horton, the contact provided by Ms. Wells, and copied the US Department of State's Ms Yvonne M. Wells at WellsYM@state.gov stating:

Dear Ms. Horton,

I write on behalf of Mr. Shawki Ahmed Omar, a United States citizen who is presently stranded in Istanbul, Türkiye, after being denied boarding on a flight to the United States because his name appears to have been placed on a U.S. government fly list. Your name was provided to me by Ms. Yvonne Wells of the Office of American Citizens Services in Washington, D.C. A power of attorney authorizing me to act on Mr. Omar's behalf is attached, along with a copy of his U.S. passport.

Mr. Omar holds no criminal convictions in the United States and has no known pending charges. He did serve a 22-year sentence in Iraq following proceedings that were widely

criticized for a lack of due process by numerous human rights NGOs as well as United Nations entities. He completed that sentence and has no other legal impediments to travel.

On 13 June 2026, Mr. Omar attempted to board Turkish Airlines flight 187 from Istanbul to Washington, DC, but he was refused boarding. The airline official informed him that the United States government had placed him on a No Fly List. He was not provided any further information and has been unable to resolve the matter on his own. He is currently staying in Istanbul with limited resources, and his condition is becoming increasingly precarious, adding significantly to his suffering.

As a U.S. citizen, Mr. Omar has an unqualified right to return to the United States. We respectfully request the consulate's immediate assistance in overcoming the administrative obstacle that is preventing his return. Specifically, we ask that the consulate:

1. Verify Mr. Omar's citizenship and the status of his passport, and advise whether an emergency travel document may be issued if his current passport has been flagged.

2. Make urgent inquiries with the appropriate agencies—DHS, TSA, and the Terrorist Screening Center—to determine the precise basis for his inclusion on a fly list, provide me this reason, and immediately initiate the process by which it may be lifted or circumvented, or, if you are unable to do this, indicate to us how this may be done.

3. Provide us with the necessary guidance and forms to file an expedited redress inquiry through the DHS Traveler Redress Inquiry Program (TRIP).

4. If Mr. Omar lacks sufficient funds to sustain himself or to purchase a ticket once the fly list issue is resolved, please inform us of the procedure and forms for a repatriation loan.

We would be grateful if you could provide a response within 24 hours outlining the steps the consulate intends to take, the reason for the restrictions on Mr. Omar's travel, and keep us informed as matters progress.

Thank you for your urgent attention to this matter.

Sincerely,
Curtis F.J. Doebbler
Attorney at Law – TX 24105187
Tel: +41-79-304-4654

Attachments: Power of Attorney and Mr. Omar's U.S. Passport (biodata page).

37. On June 17, 2026, at 10:52 CET, Ms Dana Pinoli, American Citizens Services Chief, Consular Section, U.S. Consulate Istanbul replied

Dear Dr. Doebbler,

Thank you for reaching out on behalf of Mr. Omar and for providing the executed Power of Attorney. We are sorry to hear of his situation and are committed to providing consular support within our authority.

As a U.S. citizen, Mr. Omar is eligible for consular services at post, and we are actively reviewing this matter. Please note that travel security screening programs — including any watch list designations — fall under the jurisdiction of the Department of Homeland Security (DHS) and the Transportation Security Administration (TSA). Post is not in a position to modify such designations or provide information regarding their basis.

In the interim, you or Mr. Omar may wish to explore the DHS Traveler Redress Inquiry Program (DHS TRIP), one optional avenue available to individuals who have experienced difficulties during travel screening. Authorized representatives may submit on a traveler's behalf: [web link to Traveler Redress Inquiry Program (DHS TRIP) | Homeland Security].

We will be in touch as we identify further avenues of support and appreciate your patience.

Sincerely,

Ms Dana Pinoli,
American Citizens Services Chief,
Consular Section,
U.S. Consulate Istanbul
United States of America

38. On June 22, 2026, at 18:20 CET, counsel for Petitioner sent another urgent email to the U.S. Consulate in Istanbul and the U.S. Embassy in Ankara, reporting Petitioner's detention and invoking Article 36 of the Vienna Convention on Consular Relations. Petitioner's counsel also requested consular access, verification of Petitioner's welfare, and a report to his family. Declaration of Curtis Doebbler, para. 4, attached as Exhibit D.

39. On June 25, 2026, counsel for Petitioner emailed the chief prosecutor in Gaziantep, the Turkish Ministry of Foreign Affairs, and the Turkish Ministry of Justice, requesting access to Petitioner and requesting information about his well-being and legal position. To date no reply to these emails have been received.

40. Also on June 25, 2026, the U.S. Consulate Adana responded stating: "[b]ased upon the information available to us, we understand Mr. Omar is being held at the deportation center located in Gaziantep, in southeastern Turkiye. We have expressed interest in his welfare and well-being and emphasized the potential that he may have medical needs. We understand that Mr. Omar is doing well. We are requesting a consular visit, as we do in other cases of detention of U.S. citizens." The communication was signed by Mr. Timothy J. Bugansky, Consul, U.S. Consulate Adana, Email to Curtis Doebbler (June 25, 2026) (attached as Exhibit A).

41. From the above communications, it is clear that United States government formally acknowledged that (1) Petitioner is in the custody of Turkish authorities; (2) the U.S. government has "expressed its interest" in his detention; (3) the U.S. government is aware of Petitioner's poor health, (4) the U.S. government is "requesting a consular visit"; and (4) the U.S. government has information about Petitioner's situation.

42. The U.S. government's acknowledgment of Petitioner's detention and its active engagement with Turkish authorities regarding Petitioner's welfare taken together with the statements of Turkish officials to Petitioner himself, further provide evidence that Petitioner is in the "constructive custody" of the United States. The government cannot now argue that it lacks control over Petitioner's detention when it has affirmatively exercised its authority to intervene on his behalf.

LEGAL ARGUMENTS

CAUSES OF ACTION

COUNT I
WRIT OF HABEAS CORPUS
(28 U.S.C. §2241)
(Unlawful Restraint on Liberty and Constructive Federal Custody)

43. Petitioner realleges the preceding paragraphs.

44. The writ of habeas corpus extends to persons held "in custody in violation of the Constitution." 28 U.S.C. §2241(c)(3). Custody is not limited to physical detention, but includes "besides physical imprisonment, other restrains on a man's liberty, restraints not shared by the public generally" that can support the issuing of habeas corpus. *Jones v. Cunningham*, 371 U.S. 236, 240 (1963). For example, the statute applies to U.S. citizens held

abroad where the United States retains the power to control or produce the detainee. *Munaf v. Geren*, 553 U.S. 674, 689 (2008).

45. In this case, the Petitioner is held at the behest of, or with the involvement of, the United States. By using the No Fly List to strip an American citizen of his sole statutory right to board a flight to his native country, Respondents have exercised an absolute, unconstitutional constructive restraint on Petitioner's liberty, leaving him stranded under immediate threat of foreign incarceration and torture, which they have sought to be exercised by a foreign State. See *Abu Ali,* 350 F. Supp. 2d at 47–48 (habeas corpus applies where federal directives actively manipulate or dictate a citizen's confinement or restraint abroad).

**U.S. Government Custody and Control over Petitioner**

46. The facts establish that the United States exercises constructive custody over Petitioner through a foreign intermediary. Specifically, that (a) the United States placed Petitioner on the No-Fly List, preventing his return; (b) Turkish authorities informed Petitioner they were acting at the request of U.S. officials;(c) U.S. consular officials have acknowledged and engaged with his detention; (d) U.S. officials have provided inconsistent and evasive responses regarding his status; and (e) the United States has refused to facilitate his return despite being the sole impediment to his repatriation.

47. The government's use of the No Fly List to prevent a citizen from returning to his own country, combined with its acting together to ensure Petitioners foreign detention, constitutes a severe restraint on individual liberty sufficient to satisfy the custody requirement. *See Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973) (holding that "[t]he custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty.").

48. These facts support the reasonable inference that Petitioner's foreign detention is being effected at the direction of, or with the acquiescence of, the United States, and that Türkiye is functioning as a surrogate custodian. *See Abu Ali, 350 F. Supp. 2d at 41.*

49. The government cannot evade habeas jurisdiction by outsourcing detention to a foreign state while maintaining control and direction over the citizen's confinement. *See Munaf v. Geren*, 553 U.S. 674, 680 (2008) (holding that "the habeas statute extends to American citizens held overseas by American forces operating subject to an American chain of command" and

rejecting the government's argument that jurisdiction is defeated merely because U.S. forces operate as part of a multinational force); *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (reaffirming "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law"); *see also Rasul v. Bush*, 542 U.S. 466, 481-484 (2004) (holding that habeas jurisdiction extends to persons detained abroad where the United States exercises de facto control over the detention). As the D.C. Circuit has made clear, "teaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the United States officials' unlawful acts." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1542 (D.C. Cir. 1984) (en banc) (emphasis in original), judgment vacated on other grounds and remanded, 471 U.S. 1113 (1985).

50. Petitioner is therefore in the constructive custody of the United States, and this Court has jurisdiction to issue the writ. *Abu Ali,* 350 F. Supp. 2d at 41 (holding that a U.S. citizen detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody where he alleged detention at the behest of the United States).

51. Finally, a petition for a writ of habeas corpus under 28 U.S.C. §2241 must generally name the petitioner's immediate custodian and be filed in the district of confinement. *Rumsfeld v. Padilla*, 542 U.S. 426, 435-36, 447–50 (2004). In *Padilla*, the Supreme Court rejected the argument that an U.S. official could be considered the custodian simply by virtue of his position atop the chain of command, holding instead that the "immediate custodian" rule requires naming the warden or the commanding officer with direct day-to-day control over the prisoner. *Id*. at 435-36. The Court further held that jurisdiction lies only in the district of the petitioner's physical confinement. *Id*. at 443.

52. This precedent creates an impossible situation for a detainee whose location and custodian are deliberately concealed. In this case, the detainee is held at an undisclosed location by unknown custodians whose identity is intentionally being considered together with their cooperation in his detention. Under *Padilla*, Petitioner cannot simply name high-level officials as respondents. Nor can Petitioner file in a particular district, because the district of confinement itself is not being disclosed. The result is not that the jurisdictional rules are relaxed; it is that the government's secrecy makes compliance with those rules categorically impossible. In such circumstances, a court is not expanding *Padilla*'s exceptions—there are

none—but rather confronting a scenario in which strict application of the rule would operate as an absolute suspension of the writ, contrary to the Suspension Clause, U.S. Const. art. I, §9, cl. 2. The government cannot rely on its own concealment of the detainee's location to defeat jurisdiction by effectively suspending the writ of habeas corpus. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525-26 (2004) (plurality opinion) (rejecting the government's attempt to insulate detention from judicial review through unreviewable executive determinations); *cf. Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008) (holding that the privilege of habeas corpus cannot be withdrawn in the absence of adequate alternative procedures).

53. To hold otherwise would permit the Executive to evade constitutional scrutiny by outsourcing detention to a foreign state while maintaining effective control over the citizen's confinement—a result the courts have consistently rejected. *See Abu Ali*, 350 F. Supp. 2d at 41-42 ("The authority sought would permit the executive, at his discretion, to deliver a United States citizen to a foreign country to avoid constitutional scrutiny, or … work through the intermediary of a foreign country to detain a United States citizen abroad.") and *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion) (internal citations omitted). (noting the interest in being free from physical detention by one's own government is "the most elemental of liberty interests.").

### Lack of Domestic Remedies

54. Although Petitioner, his family, and the U.S. government believe that Petitioner is held by the Turkish authorities, the Turkish authorities have refused to confirm that Petitioner is being held or where he might be held. Moreover, they have indicated that he is being held at the request of the U.S. government.

55. In such circumstances, it is not possible for Petitioner in a foreign country, with dwindling resources, no knowledge of the local language, and who was just released after 22-years of detention, to mount a legal challenge to his detention abroad.

### Imminent and Irreparable Harm

56. On June 23, 2026, Petitioner called Mr. Simsek and stated he had been taken to a deportation center. Declaration of Mustafa Simsek, para. 8, attached as Exhibit C. Petitioner's deportation

Habeas Petition of Mr. Shawki Ahmed Omar

can therefore be deemed imminent as Turkish authorities have indicated the intent to deport him, although his destination remains unknown.

57. Petitioner is in danger of being deported to a country where he faces a real risk of torture, including Jordan—a country that has interrogated his family members about his whereabouts and activities or being subjected to torture in Türkiye at the behest of the United States in light of the fact that he has already once been turned over to a country that tortured him, by United States officials. Declaration of Sandra Omar, attached as Exhibit E. Petitioner has a history of being tortured by U.S. and Iraqi authorities, and he faces a real and imminent risk of further torture if deported to a third country.

58. If Petitioner is deported before this Court can act, he will suffer irreparable harm. His constitutional rights to due process will be violated, he may be subjected to torture, see exhibit and he may further be prevented from returning to the United States. He will be separated from his wife and nine U.S. citizen children.

59. Just as "[t]o deport one who so claims to be a citizen obviously deprives him of liberty… and may result also in loss of both property and life, or of all that makes life worth living," *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922), to prevent a U.S. citizen from entering the United States without notice and without reasons denies a citizen a constitutional right to re-enter and reside within the territory of the United States.

60. The United States Supreme Court has repeatedly established that the right of a citizen to travel internationally and return home is a core component of the "liberty" protected by the Fifth Amendment Due Process Clause. *See Kent v. Dulles*, 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment.") and *Aptheker v. Secretary of State*, 378 U.S. 500, 505–06 (1964) (reaffirming that travel restrictions interfere with the fundamental Fifth Amendment liberties).

COUNT II
VIOLATION OF THE FIFTH AMENDMENT
(Procedural Due Process)

61. Petitioner realleges the preceding paragraphs.

62. The administrative imposition of a travel ban that isolates a citizen outside the United States and prevents them from returning to the United States without notice, a statement of reasons,

Habeas Petition of Mr. Shawki Ahmed Omar

or an immediate opportunity for a neutral hearing violates procedural due process. *See Jibril v. Mayorkas*, 20 F.4th 804, 813–14 (D.C. Cir. 2021) (confirming judicial standing to challenge federal travel deprivations).

63.   The D.C. Circuit has confirmed that plaintiffs who plausibly allege they remain on a government watchlist and face imminent harm from that status have standing to pursue such claims. *Jibril v. Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021) (holding that plaintiffs "plausibly allege that they have future travel plans" and that "the treatment they endured went well beyond what typical travelers reasonably expect during airport screenings," establishing an "imminent threat of future injury"). The No Fly List designation, applied without notice or a meaningful opportunity to be heard "deprives [a citizen] of his liberty interest in international travel without due process of law." *Mohamed v. Holder*, No. 1:11-cv-50, 2011 WL 1793396, at *6 (E.D. Va. Jan. 18, 2011), appeal dismissed, No. 17-1814 (4th Cir. Dec. 22, 2017).

64.   The denial of procedural protections is particularly egregious. Petitioner has been deprived not merely of the ability to travel, *see Kent v. Dulles*, 357 U.S. 116, 125 (1958) (holding that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law.") and *see also United States v. Laub*, 385 U.S. 475, 481 (1967), but Petitioner is also being denied his constitutionally protected liberty interest in returning to his own country.

COUNT III
VIOLATION OF THE FIFTH AMENDMENT
(Substantive Due Process: Infringement on Family Integrity and Right to Return)

65.   Petitioner realleges the preceding paragraphs.

66.   The Constitution protects not only a citizen's right to be free from arbitrary detention, but also the integrity of the family unit against unjustified governmental interference. When the U.S. government effects or facilitates a citizen's detention abroad—whether directly or through a foreign sovereign—it foreseeably and coercively separates that individual from his spouse and children, inflicting severe and ongoing harm on the family relationship itself. That compelled separation implicates the fundamental liberty interest in family integrity protected by the Due Process Clause. *See Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977). The forced separation of a husband from his wife and children, especially after 22

years of prior separation, is a profound injury to the fundamental liberty interest in family integrity.

67. At the same time, the government cannot evade constitutional limits on arbitrary detention by outsourcing custody to a foreign state. *See generally, Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004), and, *Abu Ali,* 350 F. Supp. 2d at 39. Accordingly, the injury here is twofold: the unconstitutional deprivation of liberty through proxy detention, and the derivative but independently cognizable violation of the family's right to remain together, evidenced by the severe emotional and structural harm inflicted on the spouse and children.

68. Petitioner is being denied his constitutionally protected liberty interest in returning to his own country. The Supreme Court has made clear that the rights attendant to United States citizenship cannot be involuntarily abridged, and that citizenship necessarily entails the ability to remain part of—and return to—the national community. *See Afroyim v. Rusk*, 387 U.S. 253, 268 (1967); *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). The government's actions here, which effectively bar Petitioner from boarding transportation necessary to return to the United States, thus impose a severe deprivation of that core liberty interest without constitutionally sufficient process.

69. This deprivation is compounded by the forced, extrajudicial separation of Petitioner from his wife and children, which infringes the fundamental liberty interest in the integrity of family life protected by the Due Process Clause. See Moore v. City of East Cleveland, 431 U.S. 494, 499 (1977). The Supreme Court has repeatedly emphasized that liberty includes freedom from arbitrary executive restraint, including confinement or its functional equivalent imposed without due process of law. See Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004). That principle applies with equal force where, as here, the government employs indirect means—effectively preventing a citizen's return and resulting in prolonged separation from his family—to impose a severe restraint on liberty without affording adequate procedural safeguards.

COUNT IV<br>VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT<br>(5 U.S.C. §706(2)(A))

70. Petitioner realleges the preceding paragraphs.

71. The Administrative Procedure Act states that the courts "shall … hold unlawful and set aside agency action" that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

72. Respondents placement of Petitioner on the No Fly List without notice, explanation, or an opportunity to respond is arbitrary and capricious agency action in violation of 5 U.S.C. §706(2)(A).

## COUNT V
## VIOLATION OF THE CITIZEN NON-DETENTION ACT
### (18 U.S.C. §4001(a))

73. Petitioner realleges the preceding paragraphs.

74. By causing Petitioner to be detained by foreign agents under color of law, Respondents have violated and continue to violate the Citizen Non-Detention Act, 18U.S.C. §4001, which establishes that: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."

75. There has been no Congressional authorization to detain Petitioner and Respondents lack the minimum requirements to establish probable cause necessary to issue a warrant for his arrest. No legal basis for his arrest and detention has ever been provided.

76. Petitioner has been detained "by the United States" by Respondents, acting in their official capacities, arrested and imprisoned indefinitely without charges and then facilitated his arrest by Turkish officials acting as their agents.

## COUNT VI
## VIOLATION OF THE CONVENTION AGAINST TORTURE (1465 U.N.T.S. 85)
## AND ITS IMPLEMENTING STATUTE (18 U.S.C. §2340A)

77. Petitioner realleges the preceding paragraphs.

78. By the actions described above, Respondents, acting under color of law, may have violated and are continuing to violate international law and U.S. treaty obligations binding on the U.S. under Article VI of the Constitution, *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85 (1984). Respondents, acting under color of law, have further violated the CAT implementing statute, fully incorporating these requirements into domestic law, 18 U.S.C. §2340A.

Habeas Petition of Mr. Shawki Ahmed Omar

79. On information and belief, the Respondents knew of and have continued the torture of Petitioner subjecting him to detention by the Turkish authorities knowing that torture is widespread in Turkish prisons. *See* Exhibit K - Department of State Türkiye Human Rights Report 2024, at pp. 1, 3, 4, 22, 24-25, and 28.

80. By acting together with Turkish officials, their agents, Respondents may be violating Petitioner's right not to be tortured under U.S. domestic law and international law. Moreover, Respondents, acted under color of law and therefore further violated Public Law 105-277 §2242, Foreign Affairs Reform and Restructuring Act, Pub. L. No.105-277, §2242, 1999 U.S.C.C.A.N. (112 Stat. 2681), by engaging in the practice of rendition to torture, namely placing an individual in the custody of a foreign government for purposes of interrogation in connection with suspected terrorist activities where harsh forms of interrogation are employed.

81. Although Respondents did not send Petitioner to Türkiye, they apparently accomplished the same objective as the rendition for interrogation policy by requesting their agents, Turkish officials, to arrest, detain, and interrogate him in furtherance of U.S. interests.

82. Respondents were aware of or should have been aware of the prison conditions in Türkiye, and the reputation of the Turkish government to torture detainees, when they directed Petitioner's detention in Türkiye. *See* Exhibit K - Department of State Türkiye Human Rights Report 2024, at pp. 1, 3, 4, 22, 24-25, and 28. These conditions are reported by the U.S. government as conditions and practices that include, but are not limited to, detention without charge and detainee abuse amounting to torture and denial of due process. *Id*., *generally*.

COUNT VII
VIOLATIONS OF THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (999 U.N.T.S. 171) AND CUSTOMARY INTERNATIONAL LAW

83. Petitioner realleges the preceding paragraphs.

**Treaty Law**

84. By acting together with Turkish officials as their agents to detain Petitioner in Türkiye under color of law, Respondents have violated the International Covenant on Civil and Political Rights(hereinafter "ICCPR"), 999 UNTS 171 (1966), which was ratified by the U.S. on June

1, 1992, deposited with the United Nations Secretary General on June 8, 1992, and entered into force for the United States on September 8, 1992, 1976.

85. Article 7 of the ICCPR prohibits torture. This prohibition includes facilitating a person's detention by a State or authority that is likely to torture him. Respondents, under color of law, are violating Article 7 of the ICCPR by detaining Petitioner through their agents, who are Turkish officials, without issuing a warrant for his arrest, charging him with a crime, or affording him a hearing. *Id*. at art. 7.

86. Article 9, paragraph 4, of the ICCPR requires that "[a]nyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful." *Id*. at art. 9, paragraph 4. Respondents, under color of law, violated Article 9, paragraph 4, of the ICCPR by detaining Petitioner through their agents, Turkish officials, without issuing a warrant for his arrest, charging him with a crime, or affording him a hearing.

87. Article 12, paragraph 4, of the ICCPR states that "[n]o one shall be arbitrarily deprived of the right to enter his own country." *Id*. at art. 12(4). Respondents, under color of law, violated Article 12, paragraph 4, by, on knowledge and belief, acting or instructing Turkish officials and Turkish Airlines to act to deny detaining Petitioner boarding of his flight on June 13, 2026, from Istanbul to Washington, D.C. and thereby denying this U.S. citizen the right to enter the United States, his own country.

88. The United States of America ratified the ICCPR on September 8, 1992, without any specific reservations or understandings related to the stated provisions of the ICCPR. The Senate when ratifying the treaty, S. Rep. No.102-23 (1992) at 650, and the United States in a reservation it deposited with the treaty's depository the Office of the United Nations Secretary General, "that the provisions of article 1 through 27 are Covenant is not self-executing," but also recognized "[t]hat it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant." Declaration of the United States when depositing its ratification on June 8, 1992. Although the Senate noted that they considered the treaty to be not self-executing, the Senate ratified the treaty with the

understanding that the original provisions and specific reservations were already "compatible with existing U.S. domestic law," S. Rep. No.102-23 (1992) at 650, and, therefore required no "implementing legislation," *Id*. at 657.

89. Executive officials of the US. Government are bound by treaties that have received the advice and consent of the United States Senate, as the U.S. Constitution expressly states that the President of the United States "shall take Care that the Laws be faithfully executed," including as indicated above international law. U.S. Const. art. II, §3. These treaties should also be applied by the Court whenever an exercise of Executive authority raises an issue of consistency with the United States' treaty obligations.

90. The Supreme Court of the United States has frequently reviewed executive power based on treaties. Justice John McLean, in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1932), held that treaties with native American Nations are treaties that "must be respected and enforced by the appropriate organs of the Federal Government." *Id*. at 594. In *Dooley v. United States*, 182 U.S. 222 (1901), Justice Henry Billings Brown cited with approval the seminal work of American General Henry Wager Halleck, a jurist and expert in international law, stating that the "[t]he stipulations of treaties . . . are obligatory upon the nations that have entered into to them . . . and therefore the Executive is bound by the laws of war that are international law. *Id*. at 231–32, citing Bart, S.H., HALLECK'S INTERNATIONAL LAW, Vol. II, 433 (1878). More recently, in *Hamdan v. Rumsfeld*, 548 U. S. 557 (2006), the U.S. Supreme Court applied international law to an armed conflict involving the United States and held that ". . . the Executive is bound to comply with the rule of law . . ." including international law. *Id*. at 635.

91. Treaties are expressly made part of U.S. law by the U.S. Constitution that expressly states that "all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the Land." U.S. Const. art. IV, cl. 2.

92. During the founding of the United States, two of the most prominent founders, Alexander Hamilton and John Jay, expressed the opinion that treaties were binding and should be applied by U.S. courts. *See* THE FEDERALIST NO. 22 at 197 (Hamilton); NO. 80 at 501–03 (Hamilton); NO. 64 423–24 (Jay). The U.S. Supreme Court has repeatedly recognized that treaties are part of U.S. law and must be applied by the Court. *See, e.g*., *Missouri v. Holland*, 252 U.S. 416 (1920); Cook v. United States, 288 U.S. 102 (1933); *Kolovrat v. Oregon*, 366 U.S. 187 (1961); *Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017); *see also* Paust, J.J.,

Habeas Petition of Mr. Shawki Ahmed Omar

"Actual Commitment to Compliance with International Law and Subsequent Supreme Court Opinions: A Reply to Professor Moore," 39 Hous. J. Int'l L. 57 (2017). Adherence to treaty obligations is particularly important when application of the treaty carries significance for the United States in international affairs. As Justice James Iredell stated long ago, and is equally valid today,

> a treaty, when executed pursuant to full power, is valid and obligatory, in point of moral obligation, on all, as well on the legislative, executive, and judicial departments . . . as on every individual of the nation, unconnected officially with either, because it is a promise in effect by the whole nation to another nation, and if not in fact complied with, unless there be valid reasons for noncompliance, the public faith is violated. *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 272 (1796).

93. Treaties that the United States has ratified must be applied by U.S. courts because Article II of the U.S. Constitution makes those treaties applicable both in and of themselves and as part of U.S. law, and because the U.S. Supreme Court itself has affirmed the application of treaties to relevant disputes. For the foregoing reasons, in reviewing the actions of the Executive in this case, this Court should consider the treaties that the United States has ratified as part of U.S. law.

## Customary International Law

94. Similarly, the rights protected in articles 7 and Article 9 of the ICCPR have entered into the realm of legally binding customary international law that prohibits State sponsored torture and prolonged arbitrary detention. *See* Restatement (Third) of Foreign Relations Law of the United States (hereinafter Third Restatement), §702 (1987); *also see* American Declaration of the Rights and Duties of Man, O.A.S. Res. XXX, 9th Int'l Conference of American States, arts. I, II, VI, XI, XXV, and XXVI, O.A.S. Official Record, OEA/Ser.L/V./II.23, doc.21 rev.6 (1948).

95. The right to enter one's own country is also emerging customary international law that this Court should apply because it is widely recognized in both legally binding and aspirational instruments of international law. The Universal Declaration of Human Rights, article 13. Paragraph 2, G.A. Res. 217 A (III) (Dec. 10, 1948), states "[e]veryone has the right to leave any country, including his own, and to return to his country." Although not legally binding

the United States played a major role in the drafting of this seminal instrument with former First Lady Eleanor Roosevelt chairing the United Nations Human Rights Commission that drafted the instrument. As already noted, Article 12, paragraph 4, of the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), provides that "[n]o one shall be arbitrarily deprived of the right to enter his own country." This treaty is legally binding on the United States. It is inconsistent for the United States to agree to a provision of a legally binding treaty that has 175 State parties—more than 90% of the State Members of the United Nations—and then try to avoid its application as customary international law.

96. Respondents violated customary international law prohibiting arbitrary detention as reflected in Article 9 of the ICCPR by detaining Petitioner through their agents without charge.

97. Respondents also violated the customary international law prohibition of "torture" and "cruel, inhuman or degrading treatment or punishment," as reflected in Article 7 of the ICCPR, by acting with their agents, Turkish officials, to place Petitioner in a situation where his torture is likely or may have already occurred, by torturing Petitioner, and by turning Petitioner over to the Iraqi authorities, which they knew or should have known would torture Petitioner.

98. Respondents may also have violated the customary international law right of Petitioner to return to and enter the United States, his country of nationality by acting with their agents, Turkish officials, to deny Petitioner the right to fly to the United States on June 13, 2026, and subsequently acting together with Turkish authorities to effect the detention of Petitioner without charges.

99. Customary international law should be applied by the Court because it is part of U.S. law according to both the Constitution, U.S. Const. art. III, §2, cl. 1, and the holdings of the U.S. Supreme Court.

100. The Supreme Court has consistently recognized that customary international law is part of U.S. law and that it will apply such law. This Court has stated that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations [i.e. customary international law]." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004).

101. Indeed, the first Chief Justice of the Supreme Court, Chief Justice John Jay, expressly charged grand juries "that the laws of nations make part of the laws of this and of every other civilized nation. They consist of those rules for regulating the conduct of nations towards

each other; which, resulting from right reason, receive their obligations from that principle and from general assent and practice." John Jay, C.J., *Charge to Grand Juries: The Charges of Chief Justice Jay to the Grand Juries on the Eastern Circuit at the Circuit Courts held in the Districts of New York on the 4th day of April, of Connecticut on the 22d day of April, of Massachusetts on the 4th day of May, and of New Hampshire on the 20th day of May, 1790,* in 3 THE CORRESPONDENCE AND PUBLIC PAPERS OF JOHN JAY 387, 393 (Henry P. Johnston ed., 1891).

102.  Justice Gray, writing the opinion for the Court in *Hilton v. Guyot*, 159 U.S. 113 (1895), expressly agreed, stating that "[t]he most certain guide … [to the applicable international law] is a treaty or a statute . . . [but] when … there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is …." *Id*. at 163. The opinion states further that "[i]nternational law, in its widest and most comprehensive sense . . . is part of our law, and must be ascertained and administered by the courts of justice as often as such questions are presented in litigation between man and man, duly submitted to their determination." *Id*.

103.  In *The Paquete Habana*, 175 U.S. 677 (1900), Justice Gray, again writing the opinion for the Court, stated that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination." *Id*. at 700. Justice Gray further clarified that "[t]his rule of international law is one which . . . [this Court] … administering the law of nations are bound to take judicial notice of, and to give effect to …" *Id*. at 708.

104.  This Court has again recently recognized that customary international law is part of U.S. law and must be applied by the U.S. courts. *See Bolivarian Republic of Venezuela, et al., v. Helmerich & Payne International Drilling Co., et al.*, 581 U.S. 170 (2017). This view is shared by the THIRD RESTATEMENT, reading "[i]nternational law and international agreements of the United States are law of the United States . . . [c]ases arising under international law or international agreements of the United States are within the Judicial Power of the United States …." *Id*. at §111.

105.  Reviewing the constitutional history of Executive authority in light of international law, Professor Jordan J. Paust, one of the foremost authorities on international law in U.S. courts, concluded that the U.S. Constitution

Habeas Petition of Mr. Shawki Ahmed Omar

documents an early expectation that international law is part of the supreme federal law to be applied at least by the Executive and the judiciary. It also documents broader legal policies at stake, all of which make it quite evident that if the President violates constitutionally based international law, he violates not only his constitutional oath and duty, but also the expectations of the Framers—still generally shared—about authority, delegated powers and democratic government. Paust, J.J., "May the President Violate Customary International Law? (Cont'd): The President is Bound by International Law," 81 AM. J. INT'L L. 377, 378 (1987).

106. This expectation was reiterated by the Supreme Court in *The Paquete Habana*, 175 U.S. 677 (1900), that found that while Congress may authorize action contrary to the mere "usage" of the international community of States, action may not be taken by the Executive merely "by direction of the Executive, without express authority from Congress." *Id*. at 711.

107. Finally, the *Charming Betsy* doctrine counsels that "an Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). As a consequence, this Court should interpret the right of Petitioner the law in a manner that is consistent with customary international law.

108. Such an interpretation is part of the Court's obligation to uphold the rule of law and to preserve the system of constitutional democracy of the United States for several reasons.

109. First, the U.S. Constitution and the precedents of this Court interpreting the Constitution indicate that international law—both treaties and customary international law—are part of United States law. The U.S. Constitution expressly declares treaties to be part of U.S. law, and this Court has repeatedly recognized that customary international law is part of the laws of the United States that must be applied by the courts. When international law is overlooked, relevant law is not applied to decide a case at law. In this case, international law is relevant law that should be applied.

110. Second, the United States has represented to its own people that it will respect international law by ratifying treaties in which it undertakes to guarantee certain rights to all individuals under its jurisdiction, such as the prohibition of torture, the prohibition of arbitrary detention and the right to free movement, including the right of a U.S citizen to return to and enter the United States. These rights are essential to the trust of the American people in their

government. It is incumbent that the Executive branch uphold such representations to the American people for the proper functioning of the government as envisioned by the U.S. Constitution. The Court should ensure this crucial trust is maintained.

111. Third, respect for international law is essential to the reputation of the United States in the international community. By ratifying treaties and participating in international affairs, the United States represents to the international community that it will respect international law. As Professor Louis Henkin wrote more than forty years ago, and is still true today, "almost all nations observe almost all principles of international law and almost all of their obligations almost all of the time." Henkin, L., HOW NATIONS BEHAVE: LAW AND FOREIGN POLICY 47 (2d ed., 1979). Nations that do not respect international law open themselves to international ridicule and expose themselves to charges of being rogue States. Any failure of the United States to respect international law harms the United States and is inconsistent with the consensus of States expressed in the text of the Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331 (1969), entered into force January 27, 1980, which although only signed and not ratified by the United States, expresses a widely accepted rule of customary international law in article 27 that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty." *Id*. art. 27. Article 26 of the Vienna Convention, further declares that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." *Id*. art. 26. The THIRD RESTATEMENT notes that "[a] state violates international law if, as a matter of state policy, it practices, encourages, or condones … a consistent pattern of gross violations of internationally recognized human rights." *Id*. §702. A Comment to this provision of the THIRD RESTATEMENT observes that "the obligations of the customary law of human rights are erga omnes," thus an obligation owed to all states and in which all States have an interest of enforcement. *Id*. Comment b. Therefore, when the United States ignores international law, it harms the reputation of the U.S. in the international community. It also subjects the U.S. to the possibility of being found responsible for an internationally wrongful act by international bodies, such as United Nations special mandate holders. This is the case because, as the THIRD RESTATEMENT notes, failure to apply a rule of international law in a domestic context "does not relieve the United States of its international obligation or of the consequences of a violation of that obligation."

*Id*. at §115. This Court should safeguard the reputation of the United States by ensuring the application of international law.

112. Fourth, disrespect for international law imposes significant restrictions on the ability of future administrations to conduct international affairs in the best interest of the American people. Regardless of domestic law, the United States may face consequences for having committed an internationally wrongful act if any organ of the State acts in violation of its international legal obligations. These consequences or reparations for injuries are summarized in the International Law Commission's Draft Articles on State Responsibility, annexed to U.N.G.A. Res. 56/83 of December 12, 2001, and corrected by U.N. Doc. A/56/49(Vol. I)/Corr. 4., as including restitution, compensation, satisfaction, and interest on any principal sum due. *Id*. arts. 35–38. The commission of an internationally wrongful act also entitles States that are injured by the act to take countermeasures against the responsible State. *Id*. art. 22. Moreover, if the internationally wrongful acts are serious, as acts of systemic discrimination based on religion or national origin and targeting large numbers people are likely to be, all States in the international community "shall cooperate to bring to an end through lawful means any serious breach." *Id*. art. 41.

113. These negative consequences are likely to affect the foreign relations of the U.S. government for many years. These are also reasons why this Court should, whenever possible, ensure respect for international law.

## COUNT VIII
### EQUITABLE CLAIM FOR STATUTORY FEES AND COSTS
(28 U.S.C. §2412)

114. Petitioner realleges the preceding paragraphs.

115. Pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. §2412(d)(1)(A), a court shall award to a prevailing party fees and other expenses incurred in any civil action brought against the United States unless the position of the United States was substantially justified. In this matter, Petitioner's claim should prevail and the U.S. government should be ordered to pay Petitioners assessed fees and expenses upon submission an itemized in a legal bill.

116. The government has provided no explanation for its actions, has refused to facilitate Petitioner's repatriation despite its statutory duty to do so, and has acted through another

State's authorities to prevent Petitioner from returning. A position that is arbitrary, unexplained, and contrary to both domestic and international obligations cannot be "substantially justified" under any reasonable interpretation of the statute. The government cannot sustain standard articulated by the Supreme Court in *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 2550 (1988). The government's position here is not "justified to a degree that could satisfy a reasonable person," *id.* at 565, because the government has actively prevented a stranded U.S. citizen from returning to his own country, despite having no legal basis to do so.

117. This Circuit has recognized that if a Petitioner prevails "the burden is on the government to show that its litigation position was substantially justified on the law and the facts." *Cinciarelli v. Reagan*, 729 F.2d 801, 806 (D.C. Cir. 1984). The refusal of ACS and federal agencies to facilitate a stranded citizen's return is entirely unjustified and attorney fees and costs are warranted.

PRAYER FOR RELIEF

118. WHEREFORE, Petitioner respectfully requests that this Court:

A. Issue a writ of habeas corpus directing Respondents to produce Petitioner before this Court or, in the alternative, to take all necessary and appropriate steps to secure his release from foreign custody and facilitate his return to the United States, and order an evidentiary hearing;

B. Declare, pursuant to 28 U.S.C. § 2201, that Respondents' actions and policies, including but not limited to:

(a) placing Petitioner on the No Fly List;

(b) preventing Petitioner from boarding a flight to the United States;

(c) causing or facilitating Petitioner's detention abroad; and

(d) failing to provide notice or an opportunity to be heard,

violate the Constitution and laws of the United States, including the Fifth Amendment, the Administrative Procedure Act, and other applicable provisions of law.

C. Order Respondents to remove Petitioner from the No Fly List, or in the alternative, to issue a waiver permitting him to fly to the United States;

D. Order Respondents to notify the Transportation Security Administration, Turkish authorities, Turkish Airlines, and any other relevant entities that Petitioner is permitted to board a flight to the United States;

E. Order Respondents to take all necessary steps to facilitate Petitioner's repatriation to the United States, including by assisting with travel documentation and, if appropriate, providing a repatriation loan;

F. Order limited jurisdictional discovery concerning Respondents' role in Petitioner's detention and inability to return to the United States, including communications with foreign authorities and air carriers, and direct the parties to meet and confer and submit a proposed schedule for such discovery within twenty-one (21) days;

G. Set this matter for a prompt status conference at the Court's earliest convenience;

H. Retain jurisdiction over this matter until Petitioner is returned to the United States and Respondents have complied with the Court's orders;

I. Award Petitioner his costs and reasonable attorney's fees pursuant to 28 U.S.C. §2412; and,

J. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Dr. Curtis F.J. Doebbler/s/            .
Dr. Curtis F.J. Doebbler, D.C. Bar No. 481243
DoebblerLaw – The Law Office of Dr Curtis FJ Doebbler
5900 Balcones Drive, 23468
Austin, TX 78731 USA
Email: cdoebbler@gmail.com
Attorney for Petitioner Shawki Ahmad Sharif Omar


Dated: June 30, 2026

LIST OF ATTACHED EXHIBITS

| Exhibit | Description |
| --- | --- |
| Exhibit A | Email Exchange with ACS Adana date June 25, 2026 |
| Exhibit B | United Nations Working Group on Arbitrary Detention, Opinion No. 05/2013 dated April 23, 2014. |
| Exhibit C | Declaration of Mustafa Simsek, dated June 23, 2026 |
| Exhibit D | Declaration of Curtis Doebbler, dated June 25, 2026 |
| Exhibit E | Declaration of Sandra Omar, dated June 23, 2026 |
| Exhibit F | Petitioner's Sworn Declaration, dated June 14, 2026 |
| Exhibit G | Petitioner's U.S. Temporary Passport (Biodata Page) |
| Exhibit H | Petitioner's Electronic Ticket and Flight Itinerary (Turkish Airlines Flight TK187, June 13, 2026) |
| Exhibit I | Recantation of Witness Against Mr. Omar in 2016 case (in Arabic and English) |
| Exhibit J | Petitioner's Power of Attorney |
| Exhibit K | Department of State Türkiye Human Rights Report 2024 |

Habeas Petition of Mr. Shawki Ahmed Omar

CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, I electronically filed the foregoing Petition for a Writ of Habeas Corpus with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel of record.

I further certify that, because this is an application for emergency relief, I caused a true and correct copy of the foregoing to be served as soon as possible after filing on the CM/ECF upon the following: the United States Attorney for the District of Columbia; the Attorney General of the United States; and counsel for Respondents at the U.S. Department of Justice, Civil Division.

/s/Curtis F.J. Doebbler/s/_____
Curtis F.J. Doebbler