# Jordan 2024 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Jordan during the year.

Significant human rights issues included credible reports of:  torture or cruel, inhuman, and degrading treatment or punishment; arbitrary arrest and detention; serious restrictions on freedom of expression and media freedom, including unjustified arrests or prosecutions of journalists and censorship; prohibiting independent trade unions or systematic restrictions on workers' freedom of association; and violence or threats against labor activists.

The government took some steps to investigate, prosecute, and punish officials who committed human rights abuses; however, impunity for such abuses remained widespread.

## Section 1. Life

### a. Extrajudicial Killings

There were no reports the government or its agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

Authorities pursued accountability for the 2022 death in custody of Zaid Dabash; family members and many commentators alleged Public Security Directorate (PSD) officers tortured Dabash to death in Marka Prison.  The police court reportedly resolved the cases against all eight PSD personnel charged with crimes related to torture and physical abuse that resulted in Dabash's death.  The court reportedly sentenced the eight individuals to one month's confinement and freed them the following month.

Police officers were tried in separate police courts when facing either criminal penalties or administrative punishment.  The quasi-governmental watchdog National Center for Human Rights (NCHR) and nongovernmental organizations (NGOs) called for police officers accused of violations of human rights to be tried in independent civil courts instead of police courts, which fell under the Ministry of Interior and which many NGOs considered less independent.  NGOs frequently complained they could not access information on the results of police disciplinary cases.

## b. Coercion in Population Control

There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

# Section 2. Liberty

## a. Freedom of the Press

The constitution provided, "the State shall guarantee freedom of opinion; and every Jordanian shall freely express his opinion by speech, writing, photography, and the other means of expression, provided that he does not go beyond the limits of the law."  Authorities, however, limited freedom of expression, including for members of the press and other media, and frequently used the antiterrorism law and cybercrimes law to arrest and harass local journalists, activists, perceived dissidents, and others expressing political views.  Government prosecutors also relied on private civil libel, slander, and defamation lawsuits to suppress criticism of public figures and policies.

Journalists, human rights, civil society organizations, legal analysts, and the UN Office of the High Commissioner for Human Rights expressed concern the vague language of the updated cybercrimes law enacted in 2023 and its implementation further limited freedom of expression and restricted civic space.  On August 13, Amnesty International reported that in the year since the law's enactment, authorities charged hundreds for social media posts critical of authorities or the government's peace treaty with Israel, expressing pro-Palestinian sentiment, or calling for peaceful protests and public strikes.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor

According to a local NGO, the mobile phones of dozens of Jordanians were targeted by Pegasus spyware during the year.  On February 1, the NGO Access Now reported it confirmed through forensic investigations that authorities targeted at least 35 persons in the country between 2019 and September 2023 using spyware provided by NSO Group cyber security company, including human rights lawyers, activists, politicians, and 16 journalists.

## Physical Attacks, Imprisonment, and Pressure

The law permitted punishment of up to three years' imprisonment for insulting the king, slandering the government or foreign leaders, offending religious beliefs, or fomenting sectarian strife and sedition.

On July 2, security services arrested well-known satirical journalist Ahmed al-Zoubi, enforcing an August 2023 appeals court ruling sentencing him to one year's imprisonment and a fine for provoking "sectarian strife" via a 2022 Facebook post criticizing the government's response to protests regarding fuel prices.  Prior to al-Zoubi's arrest and during his prison sentence, the Ministry of Justice rejected multiple appeals from his lawyers to alter the sentence to community service.  Amnesty International characterized al-Zoubi's detention as part of a widespread crackdown on dissent in the country.  On October 8, while al-Zoubi was in prison, his employer, *al-Rai* newspaper, reportedly terminated his employment, citing his absence from work for more than 10 consecutive days "without a

legitimate reason." On November 17, al-Zoubi's lawyers filed a labor case at the South Amman Court to contest his termination of employment; the case was pending at year's end.

## Censorship by Governments, Military, Intelligence, or Police Forces, Criminal Groups, or Armed Extremist or Rebel Groups

The government influenced news reporting and commentary through political pressure on editors and control over important editorial positions in government-affiliated media. Journalists of government-affiliated and independent media reported security officials used bribes, threats, and political pressure to force editors to place articles favorable to the government in online and print newspapers. According to journalists, security forces demanded websites remove some articles that criticized the government. A local NGO reported 97 percent of Jordanian journalists surveyed believed their colleagues in the country practiced self-censorship because they were moderately or extremely afraid of retaliation in their personal or professional lives. The law also held editors responsible for readers' comments on their websites, required that website owners provide the government with the personal data of their users, and prohibited the use of websites or social media platforms to publish false news, seditious content, material undermining national unity, or information intended to insult or offend a second party.

Following her arrest on May 13, independent media reported Hiba Abu Taha was sentenced on June 11 by the Amman Court to one year's imprisonment on conviction of "inciting strife" and "spreading false news over the internet" for an article she published in a Lebanese media outlet regarding allegations surrounding Jordan's role in exporting goods to Israel amid the Gaza conflict.  Human rights defenders argued the arrest was politically motivated.  On October 19, the North Amman Court fined Abu Taha 5,000 dinars ($7,000) in a separate case related to an article she wrote concerning "tourism normalization" and "suspicious" hotel guests in Amman following the Hamas attack on October 7, 2023.

## b. Worker Rights

### Freedom of Association and Collective Bargaining

The law provided for the right of workers to form and join trade unions and conduct legal strikes, but with significant restrictions.  While not expressly providing an affirmative right to collective bargaining, the law did enumerate procedural requirements for collective agreements when both labor and management voluntarily agreed.  Legally recognized unions wishing to conclude a collective bargaining agreement with an employer were allowed to do so.  The law identified specific groups of public- and private-sector workers who could organize.  It also defined 17 industries and professions in which trade unions could be established and excluded

agricultural and domestic workers.  Civil servants were not permitted to join unions.  The law required that unions for these 17 statutorily defined trade organizations belong to the government-linked General Federation of Jordanian Trade Unions (GFJTU), the country's sole trade union federation.  The establishment of unions required at least 50 founding members and approval from the Ministry of Labor.  The law authorized additional professions to form professional associations on a case-by-case basis.

The government subsidized and audited salaries and activities of the GFJTU and monitored union elections.  The government denied recognition to independent unions organized outside the structure of the government-approved federation.  The government did not meet with these unions, and the lack of legal recognition hampered their ability to collect dues, obtain meeting space, and otherwise address members' workplace concerns.  Labor organizations also reported difficulty obtaining government recognition for trade unions beyond the 17 sectors established by law, in part because new unions would require approval by a tripartite committee in which the existing 17 union heads were represented.

The law allowed foreign workers to join unions but did not permit them to form unions or hold union office, effectively limiting union formation in enterprises primarily comprising foreign workers.  No new trade union had been established since 1976.

The Labor Code prohibited antiunion discrimination and protected workers

from employer retaliation for union affiliation or activities.  The law, however, did not explicitly provide a right to reinstatement for workers fired due to antiunion views, and observers noted the Labor Code did not explicitly protect unionized and nonunionized workers from retaliation.  This was particularly the case for foreign workers in all sectors, as well as citizens working as day laborers in the public sector on short-term contracts.

In October 2023, Aseel Universal Garments factory faced cash flow challenges, leading to delayed salary payments and worker strikes.  Aseel owed 1,311 workers (854 of whom were migrants) two million dinars ($2.7 million), which the fashion companies Aseel produced for eventually paid. Labor rights activists stated the Ministry of Labor told approximately 100 Bangladeshi workers who applied to return to work that they were barred from re-entering the country due to being out of their immigration status while no longer being employed by Aseel.

When conflicts arose during labor negotiations, the law required that union representatives and employers first attempt to resolve the matter through informal mediation.  If a matter remained unresolved, the union was required to request Ministry of Labor-appointed mediation.  Ministry-appointed mediators were assigned to cases for up to 21 days.  If initial mediation failed, the case was referred to a higher mediation council composed of an employer representative, a labor representative, and a chair appointed by the minister of labor.  If the council's adjudication was

unsuccessful, the dispute went to a labor court with a panel of ministry-appointed judges for 21 days.

There were limits on the ability to strike, including a requirement to provide a minimum of 14 days' notice to the employer. The law prohibited strikes if a labor dispute was under mediation or arbitration. The law prohibited management from arbitrarily dismissing workers engaged in labor activism or arbitration, but enforcement was inconsistent. Labor organizations reported some management representatives used threats to intimidate striking workers. The Ministry of Labor reported 13 strikes through September, all of which were unauthorized and without union leadership endorsement. Strikes generally occurred without advance notice or registration.

Some foreign workers whose residency permits were tied to work contracts were vulnerable to retaliation by employers for participating in strikes and sit-ins. Participation in a legally unrecognized strike was counted as an unexcused absence under the law. The law allowed employers to consider employment contracts void if a worker was absent more than 10 consecutive days, as long as the employer submitted a written notice to the Ministry of Labor. Labor rights organizations reported instances of refusing to renew foreign workers' contracts due to attempts to organize in the workplace. Migrant workers in the garment sector were allowed to join trade unions but were unable to vote for the union chairpersons, and

migrant workers could not hold leadership positions in unions, although they could run and vote for the labor committees at factories.

The government did not fully enforce applicable laws related to freedom of association and collective bargaining.  Penalties were commensurate with those for similar civil rights violations and were regularly applied against violators if they were charged.

There were no known reports of threats of violence against union heads, although security services arrested labor activists and reportedly pressured union leaders under an implicit threat of arrest and prosecution to refrain from activism that allegedly challenged government interests.  The government had the power to dissolve unions it determined were violating labor law.

Labor NGOs working to promote the rights of workers generally focused on promoting the rights of migrant workers.  Labor NGOs faced government restrictions similar to other NGOs in the country, including the requirement to obtain advance government approval on board members, board decisions, and receipt of any foreign funding.  The law required local NGOs receiving foreign funds to submit information on the use of these funds to the Ministry of Planning and International Cooperation for approval.  In mid-November, the government reportedly suspended a February decision requiring international NGO branches to seek advance approval for foreign funding from their headquarters.  International NGOs still required approval

when receiving funding originating within or from a third country.

## Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

## Acceptable Work Conditions

### Wage and Hour Laws

The law provided for a national monthly minimum wage, which was above the official individual poverty line.

The law set a workweek of 48 hours and required overtime pay for hours worked in excess of that level.  Because there was no limit on mutually agreed overtime, the Ministry of Labor reportedly permitted employees in some industries, such as the garment sector, to work as many as 70 to 75 hours per week, and observers reported many foreign workers requested overtime work.  The law permitted compulsory overtime under certain circumstances, such as conducting an annual inventory, closing accounts, preparing to sell goods at discounted prices, avoiding loss of goods that would otherwise be exposed to damage, and receiving special deliveries.  In such cases, actual working hours could not exceed 10 hours per day, the employee had to receive overtime pay, and the period could not last more than 30 days.  NGOs reported some instances of forced overtime, but it was

unclear whether it was illegal or compulsory overtime.

Employees were entitled to one day off per week.  The law provided for 14 days of paid sick leave and 14 days of paid annual leave per year, which increased to 21 days of paid annual leave after five years of service with the same firm.  Workers also received additional national and religious holidays designated by the government.

In October, the NGO Terre des Hommes reported many child workers between ages 16 and 18 worked long hours, with 51 percent reportedly working between five to eight hours daily and many working over the weekend.  According to the report, only 22 percent of child workers received safety training and there was weak enforcement of child labor laws.

**Occupational Safety and Health**

Occupational safety and health (OSH) standards were appropriate for the main industries in the country, and employers were required to abide by all OSH standards set by the government.  The law required employers to protect workers from hazards caused by the nature of the job or its tools, provide any necessary protective equipment, train workers on hazards and prevention measures, provide first aid as needed, and protect employees from explosions or fires by storing flammable materials appropriately.  The government did not proactively identify unsafe working conditions, nor did

it consistently respond to workers' OSH complaints.  The law provided workers the right to remove themselves from a hazardous workplace without jeopardizing their employment.  The Ministry of Labor required that employers provide appropriate safety and health measures for workers at the workplace, based on the scale of the employer's economic activity including revenue, the number of workers, and the type of occupational hazard they faced.

The government required garment-exporting manufacturers to participate in the *Better Work Jordan Program*, a global initiative by the International Labor Organization and the International Finance Corporation to improve labor standards.

In the garment sector, foreign workers were more susceptible than Jordanians to dangerous or unfair conditions.  A substantial portion of the standard monthly minimum wage for foreign workers in the garment industry was used to pay for food, accommodation, and travel for workers from their home countries, according to an international NGO.

In October, Terre des Hommes reported children between ages 16 and 18 faced various abuses in the agricultural sector, including hazardous conditions such as handling dangerous machinery, exposure to harmful pesticides, and performing physically demanding tasks.  Child workers suffered accidents and occupational diseases.

In the second quarter of the year, the government's online platform received 2,543 complaints regarding various violations of the labor code.

**Wage, Hour, and OSH Enforcement**

The Ministry of Labor was responsible for enforcement of labor laws, including wage, hour, and OSH standards.  Penalties for violations were not commensurate with those for crimes such as negligence and were frequently but unevenly applied against violators.  The number of labor inspections was insufficient.  Inspectors had the authority to make unannounced inspections and could initiate the process by which sanctions were levied, but they could not themselves levy sanctions.

The Ministry of Labor did not effectively enforce minimum wage, overtime, and OSH laws.  Authorities did not effectively protect all employees who attempted to remove themselves from situations that endangered their health and safety.  Labor advocates reported employers sometimes failed to provide or actively denied adequate medical care and encouraged ill or injured workers to continue working.  Labor organizations reported women workers were more likely than men to encounter labor abuses, including wages below the minimum wage and harassment in the workplace.

Some foreign workers faced hazardous and exploitative working conditions in a variety of sectors, mostly in domestic, agricultural, and factory jobs. Garment sector workers reported working voluntarily more than 10 hours

per day if overtime was offered.  In contrast, migrant workers in the domestic help sector reported suffering from excessive unpaid working hours.

Employers reportedly subjected some workers in the agricultural sector, most of whom were Egyptians, to exploitative conditions.  According to an NGO, agricultural workers usually received less than the minimum wage.  Some employers in the agricultural sector confiscated passports.  The use of labor brokers, failure to register many farms, and lack of written contracts, combined with migrant worker status, limited agricultural workers' ability to understand their rights and seek legal remedy with the government.  Egyptian migrant workers were also vulnerable to exploitation in the construction industry, where employers usually paid migrant workers less than the minimum wage and failed to uphold OSH standards.  The Ministry of Labor conducted 1,605 inspections in the agricultural sector and issued 174 violations during the year.

In the country's employer-based visa system, migrant workers' visas were tied to their employers.  Under this system, migrant workers could not change employers without permission or leave the country without requesting time off from their employer, leaving them vulnerable to becoming victims of human trafficking, including forced labor conditions.  Migrant workers who quit their jobs without their employer's permission forfeited their legal status and risked arrest and deportation.  The employer-

based visa system enabled some employers to circumvent established labor laws which provided for a minimum wage, limits on working hours, a weekly rest day, overtime pay, and freedom of association.

Domestic workers often faced unacceptable working conditions, working long hours without holidays or days off during the week and not being paid on time.  Women domestic workers were at particular risk of physical, sexual, and psychological abuse.  NGOs reported employers regularly confiscated domestic workers' passports and other documents to restrict freedom of movement and the ability to change employers.  While domestic workers could file complaints in person with the Ministry of Labor's Domestic Workers Directorate or the PSD, many domestic workers complained there was no follow-up on their cases.  The PSD reported 108 domestic worker-related cases during the year, classifying 11 as human trafficking and 97 as labor disputes.  The Counter Trafficking Unit operated a 24-hour hotline, with limited translation capabilities.  From January through September, the unit handled five cases of forced labor.  Labor inspectors did not regularly investigate reports of labor abuses or other abuses of domestic workers in private homes, and inspectors could not enter a private residence without the owner's permission except with a court order.  Advocates reported migrant domestic workers who sought government assistance or made allegations against their employers frequently faced counterclaims of absconding or other criminal behavior by the employers.

Employees could file complaints regarding violations of the law directly with the Ministry of Labor or through organizations such as their union or the NCHR.  The NCHR reported the Ministry of Labor received 29 complaints related to labor disputes, such as financial claims and requests for improvement of working conditions, during the year.  The Ministry of Labor received 9,298 labor complaints during the year.  Of these, 3,697 were resolved at the level of the enterprise, 287 were under process at the end of the year, and 1,383 labor violations had been issued.

Employers could file criminal complaints with police stations against domestic workers for absconding.  Most fleeing domestic workers reportedly sought to escape conditions indicative of forced labor or abuse, including unpaid wages and, to a lesser extent, sexual or physical abuse.  By law, employers were responsible for renewing foreign employees' residency and work permits but often failed to do so for domestic employees.  NGOs reported authorities administratively detained foreign domestic workers and other migrant workers and did not inform them of their rights or the reasons for their detention.  Legal processes for migrant workers took years and translation services were minimal.

The Ministry of Labor did not consistently inspect and monitor all workplaces or apply all the protections of the labor code in the informal sector, which the International Labor Organization estimated could account for more than 46 percent of the country's workers.

# c. Disappearance and Abduction

## Disappearance

There were no known reports of disappearances by or on behalf of government authorities.

## Prolonged Detention without Charges

During the year, authorities reportedly held hundreds of activists without charge, and charged others with insulting the king, undermining the political regime, or slander.  Most detentions lasted for days, but some lasted months.  At times, authorities held suspects incommunicado for up to one week or placed them under house arrest.  Several human rights activists alleged authorities held arrestees incommunicado to hide evidence of physical abuse by security forces.  Security services also reportedly arbitrarily arrested, intimidated, and harassed individuals based on their sexual orientation.

The law empowered provincial governors, appointed by the minister of interior, to detain individuals administratively at their own discretion without charge or trial for investigation purposes or to protect the individual.  According to NGOs, some governors abused their detention power to bypass the criminal justice system, intimidate political activists and individuals, imprison individuals without sufficient evidence, prolong the

detentions of prisoners whose sentences had been completed, or set excessive bail.  When police had doubts regarding the innocence of a suspect, governors reportedly used administrative detentions to re-arrest individuals who had been released by prosecutors from custody.

According to the Ministry of Interior, during the year 29,077 persons served in administrative detention without charge or trial.  According to local and international NGOs, authorities routinely engaged in involuntary "protective" detention of women (a type of informal detention without trial) to deal with cases including sex outside of marriage, "absence from home," or being the target of sexual violence, all of which could put women at risk of so-called honor crimes.  Some detained women told a local NGO that self-defense from domestic violence or economic exploitation led to their detention.  Most detained women were transferred to the Ministry of Social Development-operated Amman-based shelter for women at risk of violence, but some were still held for several weeks due to the requirement that a family member provide a guarantee to protect them from attack prior to their release.

On March 30, security forces reportedly arrested trade union activists Maisarah Malas and Ziad Ibheis at a pro-Gaza protest in Amman and subsequently raided their homes.  Authorities reportedly held them for 47 days in administrative detention without charges and prevented them from meeting with their lawyer and their families before releasing them on May

16.  The activists' lawyer told media that authorities released them without filing criminal charges or providing a reason for their prolonged detention.

In April, the National Alliance for Rights and Freedoms characterized the arrest of more than 1,500 protesters and activists between October 2023 and April as "a serious setback in the field of freedom."  Authorities released the vast majority of those arrested and dropped the charges, but dozens reportedly remained in administrative detention at year's end.  Amnesty International reported many protesters were referred to court on charges under the cybercrimes law, while other were referred on charges of "insulting and resisting police."  NGOs reported that in many cases, even after the public prosecutor or a judge ordered a detainee released, the interior ministry immediately re-apprehended or kept protesters in custody using administrative detention procedures, coercing detainees to sign pledges not to protest or incite to protest under threat of a 50,000-dinar ($70,000) fine.

## d. Violations in Religious Freedom

See the Department of State's annual *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## e. Trafficking in Persons

See the Department of State's annual *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

# Section 3. Security of the Person

## a. Torture and Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution prohibited torture, including psychological harm amounting to torture, by public officials, and the penal code provided penalties up to three years' imprisonment for its use, with a penalty of up to 15 years if serious injury occurred.  Some international and local NGOs alleged government officials employed torture and other mistreatment in police and security service detention centers.  Human rights lawyers found the penal code ambiguous and supported legal reforms to define "torture" more clearly and strengthen sentencing guidelines.  The government asserted that all reported allegations of abuse in custody were thoroughly investigated, but human rights NGOs questioned the impartiality and comprehensive nature of these investigations because they took place in the police court system.  Officials tried for torture and mistreatment were often convicted of excessive use of force rather than torture.

The PSD Human Rights and Transparency Office reported receiving seven complaints with "allegations of harm" (a lesser charge than torture that did not require proof of intent) against officers for the 12-month period ending

in September; four of these complaints reportedly remained in courts at year's end.  Most alleged abuses occurred in pretrial detention.  During the 12-month period, the office reported receiving 36 allegations of mistreatment in prisons and detention centers.  As of September, seven of those cases were prosecuted and resulted in convictions, seven were dismissed due to insufficient evidence, and 16 remained in trial.  In March, six were dropped under a general pardon.

According to an NGO, male guardians occasionally requested virginity testing for female relatives detained by authorities for being "absent from the home."  The Jordanian Medical Association prohibited its members from performing virginity testing on a woman without her consent, but women and girls reportedly often felt pressured to undergo the test to avoid attracting suspicion from family members.  NGOs urged authorities to ban the use of virginity testing requests, arguing these tests violated women's rights and were a form of cruel, inhuman, or degrading treatment.

In a January 4 report, the NGO Democracy for the Arab World Now (DAWN) alleged security forces tortured and sexually assaulted Abed Elah al-Majali, who was arrested in 2022 after he claimed the NGO Jordan Heritage misused funds.  According to DAWN, al-Majali alleged in 2022 security forces forced him to disrobe, photographed him naked, sexually assaulted him anally with plastic or wooden objects, and urinated on him.  Al-Majali also reported physical threats against him and denial of medicine.  During the

year, al-Majali's lawyer, Firas al-Rousan, and activist Kamil al-Zoubi were still on trial for "broadcasting false news" and "defaming an official body," after sharing al-Majali's allegations of torture and sexual assault on Facebook in 2022.

The International Committee of the Red Cross had wide access to visit prisoners and detainees in all prisons, including the facility operated by the General Intelligence Department (GID).

## b. Protection of Children

The minimum age of consensual sex was 18, although sexual relations within court-approved marriages between children or between an adult and a child spouse were legal.  Authorities generally enforced the law related to sexual exploitation of children.  Four cases of child sexual exploitation were filed with the PSD during the year.

### Child Labor

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

### Child Marriage

The minimum age for marriage was 18, but with the consent of both a judge and a guardian, the law provided for a child as young as age 16 to be

married.  The policy was enforced inconsistently.  Judges had the authority to decide if marriage of girls between ages 16 to 18 would be "in their best interest" and to adjudicate the marriage contract.  Local authorities reported there were 5,072 child marriages in 2023, the most recent year for which data were available; many of these children were Syrian, as early and forced marriage among refugees remained high.  According to local and international organizations, some Syrian refugee families initiated early marriages for their daughters to help mitigate the stresses of poverty.

Authorities generally enforced the law related to sexual exploitation of children.  Four cases of child sexual exploitation were filed with the PSD during the year.

## c. Protection to Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees in most cases.  The government did not actively target individuals without official refugee status for deportation and tolerated informally the prolonged stay of many Iraqis and other refugees beyond the expiration of the visit permits under which they had entered the country.  Iraqi and other non-Syrian refugees accrued fines for overstaying their visit permits and were required to pay or settle the fines and penalties prior to receiving an exit visa unless they were departing for

third-country resettlement or opted to spontaneously return to their country of origin.

## Provision of First Asylum

The law did not provide for the granting of asylum or refugee status, but the government provided de facto protection for refugees through international partnerships.  The country was not a party to the 1951 Convention Relating to the Status of Refugees.  A memorandum of understanding between the government and UNHCR, however, contained the definition of a refugee, confirmed the country's adherence to the principle of nonrefoulement, and allowed recognized refugees a maximum stay of one year, during which period UNHCR was required to find them a durable solution.  The time limit was extendable, and the government generally did not force refugees to return to their country of origin, including honoring UNHCR's advisory against forced returns to Sudan.  Authorities required all Syrians in the country to register with the Ministry of Interior and obtain a ministry-issued identification card.

## d. Acts of Antisemitism and Antisemitic Incitement

There was no resident Jewish community in the country.  Antisemitic rhetoric and tropes were prevalent in local media throughout the year. Editorial cartoons, articles, and opinion pieces negatively depicted Israel and Zionism, but they did not specifically target Jews or Judaism.  Many

Jordanians continued to deliberately avoid recognizing Israel by name and instead used terms such as "Jews" or "the occupying entity" to direct criticism of Israel and its policies, which some commentators described as political semantics to refrain from normalization of Israel and not necessarily antisemitic.  The national school curriculum, including materials on tolerance education, did not mention the Holocaust and used antisemitic tropes.  Some private school curricula included information on the Holocaust.  Antisemitic hate speech proliferated in the country on social media, in public and private schools, and among protesters at demonstrations across the country condemning Israeli military action in Gaza.  Government officials publicly condemned acts of antisemitism.

# e. Instances of Transnational Repression

The government reportedly engaged in acts of transnational repression.

## Threats, Harassment, Surveillance, or Coercion

Some exiled activists and political commentators alleged security services harassed and intimidated their Jordan-based family members to pressure them to end their activism abroad.  DAWN and other NGOs alleged the GID and PSD harassed and threatened exiled activists abroad as well as their families and associates in the country.  Reports alleged the GID harassed and intimidated Jordanian asylum seekers in Canada, Europe, Türkiye, and the United States to force them to quit their activism and affiliation with

international civil society organizations promoting human rights and documenting purported abuses by the government.