**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHAWQI AHMAD OMAR,

    Petitioner,

        v.

MARKWAYNE MULLIN et al.,

    Respondents.

Civil Action No. 26-2315 (JDB)

## MEMORANDUM OPINION AND ORDER

Shawqi Ahmad Omar, an American citizen and an alleged member of Al Qaeda, is currently detained in a Turkish deportation center.  He asserts that the United States has directed Turkey to arrest and detain him, and has prevented him from returning to American soil, in violation of his constitutional and statutory rights.

Citing an imminent risk of deportation to Jordan, where he fears he will be tortured, Omar requests that the Court issue an ex parte temporary restraining order, commanding the government to assist him in flying back to the United States, and barring it from taking any actions or making any representations that would frustrate his ability to return.  But Omar has not come forward with sufficient evidence for the Court to find that he is likely to succeed on the merits of any of his claims.  Moreover, there is substantial reason to doubt that the injuries he alleges are directly traceable to the conduct of the United States that he requests this Court enjoin, and that his counsel fully complied with the procedural prerequisites for seeking an ex parte TRO.

The Court therefore denies Omar's motion.

1

**BACKGROUND**

Shawqi Ahmad Sharif Omar is an American-Jordanian citizen who traveled to Iraq in 2002. Munaf v. Geren, 553 U.S. 674, 681 (2008). He was captured by United States military forces during a raid on his home in Baghdad and transferred into Iraqi custody, where he was convicted of illegally entering Iraq and being a member of "an illegitimate group"—i.e. Al Qaeda. See id. at 681; Pet. [ECF No. 1] ¶¶ 22–23. On April 8, 2026, Iraq released Omar from prison. Pet. ¶ 25.

Following his release, the United States issued him a temporary passport, and Omar departed Iraq for Turkey. Id. ¶¶ 25–26. Then, on June 13, Omar attempted to board a Turkish Airlines flight from Istanbul to Washington. Id. ¶¶ 27, 29. But the manager at the check-in counter informed him that United States officials had told the airline that he could not board the flight because he had been placed on the No Fly list. Id. ¶ 29.

After Omar was turned away at the airport, his counsel promptly began communicating with the United States Consulate in Istanbul. Id. ¶¶ 36–38. The consulate informed him that it was actively reviewing Omar's situation and directed his counsel to the Department of Homeland Security's Traveler Redress Inquiry Program (DHS TRIP). Id. ¶ 37.

Meanwhile, Omar traveled to a city in southern Turkey. Id. ¶ 31. And on June 22, Turkish officers detained him there. Id. ¶ 32. When Omar called his wife and a Turkish contact from detention at a deportation center, he told them that Turkish authorities had arrested him upon "a request from the United States authorities." Id. ¶¶ 33–34. Omar's precise location is currently unknown. Id. ¶ 52; see also Decl. of C. Doebbler [ECF No. 3-7] ¶ 5.

Following his detention, Omar's counsel continued to communicate with American consular officials. One official informed his counsel that:

> Based upon the information available to us, we understand Mr. Omar is being held
> at the deportation center located in Gaziantep, in southeastern Turkiye. We have

> expressed interest in his welfare and well-being and emphasized the potential that he may have medical needs. We understand that Mr. Omar is doing well. We are requesting a consular visit, as we do in other cases of detention of U.S. citizens.

Pet. ¶ 40.

Over time, it became apparent that Turkey intended to deport Omar. TRO Mot. [ECF No. 3] ¶ 9. The Turkish Ministry of Foreign Affairs emailed the United States Embassy in Ankara that it planned to return Omar to the United States on a commercial flight on July 1. Decl. of C. Doebbler ¶ 5. But consular officials informed Omar's counsel that "such travel plans are not in accordance with the guidance we previously provided to you (and conveyed again in our e-mail yesterday)." Id. Following this exchange, Omar informed his counsel that Turkey was "trying to send [him] to Jordan, but [he] told them I want to go only to the United States." Id. ¶ 6. To the best of the Court's knowledge, Omar remains in Turkey.

On June 30, 2026, Omar petitioned this Court for a writ of habeas corpus, naming the Secretary of the Department of Homeland Security, the Director of the FBI, the Administrator of the Transportation Security Administration, and the Secretary of State, as respondents. Pet. at 1. Omar alleges that he is constructively detained by the United States in violation of his constitutional rights. Id. ¶¶ 45–50. He also alleges that the United States has violated his rights under the Fifth Amendment, the Administrative Procedure Act, the Citizen Non-Detention Act, the Convention Against Torture, the International Covenant on Civil and Political Rights, and customary international law. Id. ¶¶ 61–113.

And on July 1, 2026, Omar filed a motion for a temporary restraining order. TRO Mot. at 1. In that motion, he asserted that he was in imminent danger of being deported to Jordan, where he would face a risk of torture, prolonged separation from his American family, and frustration of his efforts to vindicate his constitutional rights. Id. ¶ 30. To forestall these harms, Omar requested that the Court order the government to: (1) refrain from "actions or representations that would

3

prevent [him] from exercising his right to return to the United States," (2) "proactively assist [him] in returning to the United States," and (3) "issue a flight waiver permitting [him] to board a flight in Türkiye to fly to the United States," among other relief.  Id. at 11.

Along with Omar's motion for a TRO, Omar's counsel submitted a declaration attesting that he had attempted to notify the government of his intent to seek a TRO but been unable to reach the relevant authorities.  Certificate of Conf. [ECF No. 3-1].

## **LEGAL STANDARD**

A temporary restraining order (TRO) "is an emergency procedure that is appropriate only when the applicant is in need of immediate relief."  11A Wright & Miller's Federal Practice & Procedure § 2951 (3d ed. Apr. 2026 update).  Courts thus apply the four-part standard governing motions for a preliminary injunction to TRO motions.  Id.; see also, Dellinger v. Bessent, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025); New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2 (1977) (Rehnquist, J., in chambers).  That standard requires the moving party to establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

Movants seeking a TRO prior to notifying the adverse party must also meet two procedural requirements.  Fed. R. Civ. P. 65(b)(1).  They must demonstrate that "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and the movants' counsel must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required."  Id.  The local rules require either a certificate of counsel or other proof satisfactory to

4

the Court of efforts made by the moving party to provide notice to the adverse party.  D.D.C. Loc. Civ. R. 65.1(a).

## DISCUSSION

At this early juncture, Omar's motion for a TRO fails because he has not alleged sufficient facts to establish that he is likely to succeed on the merits of his claims.  The Court is also doubtful that he has adequately alleged that he will suffer immediate and irreparable harm absent the relief he requests.  And the Court is concerned that Omar's counsel has failed to make reasonable efforts to notify the government of his motion for a TRO.

### I.   Likelihood of Success on the Merits

The Court begins with Omar's likelihood of success on the merits of his claims, the "first and most important" Winter factor.  Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

### A.  Habeas Claim

Omar petitions the Court for a writ of habeas corpus, 28 U.S.C. § 2241, alleging that his ongoing detention in Turkey violates his constitutional rights.  TRO Mot. ¶¶ 15–19.

To prevail on the merits of his habeas claim, Omar must first clear a substantial jurisdictional hurdle.  Federal courts have jurisdiction to adjudicate habeas claims asserted by American citizens detained abroad, but only where the American citizen is held "in custody under or by color of the authority of the United States."  28 U.S.C. § 2241(c)(1); see also Munaf, 553 U.S. at 686.  "An individual is held 'in custody' by the United States when the United States official charged with his detention has 'the power to produce' him."  Munaf, 553 U.S. at 686 (quoting Wales v. Whitney, 114 U.S. 564, 574 (1885)).  Evidence supporting the inference that the United States has the power to produce the petitioner may include statements or conduct evincing that (1) the petitioner's ongoing detention is at the direction of the United States, (2) the

5

petitioner would be released upon nothing more than a request by the United States, (3) the sovereign or intermediary with physical custody of the petitioner is indifferent to his detention, and (4)  the petitioner's arrest was at the behest of the United States.  See Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 68 (D.D.C. 2004).

For example, in Abu Ali, the court found sufficient evidence to deny a motion to dismiss a habeas petition—but not sufficient evidence to conclusively find habeas jurisdiction—when a petitioner detained in a Saudi Arabian prison alleged that: Saudi officials referred to his detention as "a United States matter" and informed United States officials that they would release him upon a request from the United States; the FBI repeatedly interrogated him within the Saudi prison; and American officials told his family that they would release him if he cooperated.  Id. at 38, 68.

Omar bases his assertion that the United States has the power to produce him, and this Court thus has jurisdiction over his habeas claim, on evidence that Turkey is willing to deport him by flying him to the United States, if the United States will permit him to board the airplane, and alleged statements from the Turkish authorities that arrested him that those authorities were acting "on a request from the United States."  TRO Mot. ¶¶ 7–8.  But these alleged facts are insufficient to show that Omar is likely to establish that he is in the constructive custody of the United States, especially in light of the contrary evidence contained in the limited record before the Court.

Turkey's willingness to fly Omar to the United States, if the United States were to permit him to enter its airspace, is persuasive evidence that Turkey seeks to deport Omar.  But it does not support the inference that the United States has the power to order Omar's release from immigration detention in Turkey.  Consider, for example, a hypothetical Turkish national detained within the United States immigration system.  No court would infer from the United States' intent to deport the Turkish national that Turkey has the power to order the United States to release him.

Omar's allegation that Turkish authorities arrested him upon a request from the United States does, however, raise the specter that the United States may be involved in his detention. But that allegation, by itself, cannot establish that the United States directs his continued detention, such that the United States could order Turkey to "produce him." Munaf, 553 U.S. at 686. And two pieces of record evidence indicate that Turkey is operating independently as it detains Omar, leading the Court to conclude that Omar has not yet shown that he is likely to succeed in establishing that he is in the constructive custody of the United States.

First, the United States Consul in Adana, Turkey, informed Omar's counsel that the United States is not aware of the exact facility Omar is detained in, and that while the United States has requested permission for a consular visit, it has not yet received one. See Pet. ¶ 40. The United States' lack of both knowledge of Omar's physical location and control over Omar's visitors, in stark contrast to the knowledge and control alleged in Abu Ali, undercuts Omar's assertion that the United States—not Turkey—functionally controls his detention.

Second, Omar's counsel has supplied evidence that Turkey's Foreign Ministry sought to deport Omar to the United States on July 1, 2026, via a flight from Istanbul to Washington, D.C., in contravention of "the guidance" that the United States consulate had previously provided. Decl. of C. Doebbler ¶ 5. That Turkey sought to deport Omar by flying him to the United States, despite the United States' apparent refusal to permit him to fly within the country's airspace, again evinces that it is Turkey, not the United States that is controlling the terms of his detention and deportation.

Considering that Omar has alleged scant facts supporting the inference that the United States controls Omar's detention such that it could "produce him," and the evidence in the record that Turkey is acting independently as it detains Omar and prepares to deport him, Omar has not

demonstrated, at this early procedural posture, that he is likely to succeed in establishing this Court's jurisdiction to adjudicate his habeas petition.[1]

### B. Fifth Amendment Procedural Due Process Claim

Omar also claims that his presumed placement on the No Fly list, without prior notice, explanation, or an opportunity to respond, violates his Fifth Amendment due process rights. TRO Mot. ¶ 20–21. But Omar may seek review of his alleged placement on the No Fly list through the Department of Homeland Security's Traveler Redress Inquiry Program (TRIP). See, e.g., Khalid v. TSA, 172 F.4th 866, 870 (D.C. Cir. 2026); see also Pet. ¶ 37 (alleging that the United States Consulate in Istanbul has informed Omar's counsel that he "may wish to explore" the DHS TRIP program). And the D.C. Circuit has repeatedly held the "TSA through DHS Trip provides constitutionally adequate process" to persons placed on the No Fly list. Khalid, 172 F.4th at 873; see also Busic v. TSA, 62 F.4th 547, 549 (D.C. Cir. 2023).

Given the availability of the DHS TRIP process and contrary, binding precedent from the D.C. Circuit, the Court concludes that Omar is unlikely to succeed on the merits of his Fifth Amendment procedural due process claim.

### C. Administrative Procedure Act Claim

In parallel with his Fifth Amendment procedural due process claim, Omar alleges that the process by which he was placed on the No Fly list violates his rights under the Administrative Procedure Act (APA) because he was not given notice of his placement, an opportunity to contest the placement, or a rationale for the placement. TRO Mot. ¶ 23. But Omar does not cite—and the Court was unable to find—any law supporting the proposition that the APA demands that agencies

---

[1] Omar has not demonstrated likelihood of success on the merits of his Citizen Non-Detention Act claim for the same reasons. The Citizen Non-Detention Act provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a). But again, Omar has not yet alleged sufficient facts to establish that he is being "detained by the United States."

give affected persons notice of every finding that they make.  And as this Court has explained, Omar has an avenue—DHS TRIP—to contest his alleged placement on the No Fly list, receive an explanation for that placement, and ultimately seek review of the explanation.  See, e.g., Khalid, 172 F.4th at 873; Busic, 62 F.4th at 550; 49 U.S.C. § 46110 (providing for judicial review of final TSA orders resulting from DHS TRIP applications).  Consequently, Omar has failed to establish that he is likely to succeed on the merits of his APA claim.

### D.  Substantive Due Process Claim

Next, Omar claims that the United States is violating his substantive due process rights under the Fifth Amendment.  TRO Mot. ¶ 22.  Specifically, he alleges that the government is violating his rights to return and reside within the United States, and to reunite with his family.  Id.

The D.C. Circuit has held that placement of a United States citizen, residing abroad, on the No Fly list does not violate their substantive due process rights because Americans do not have a fundamental right to fly.  Khalid, 172 F.4th at 873 ("While Americans enjoy the right to travel, that does not imply a fundamental right to travel by airplane." (citation modified)); see also Busic, 62 F.4th at 550.  So Omar must do more than show that he has been placed on the No Fly list to demonstrate that he is likely to succeed on his Fifth Amendment substantive due process claim. He must come forward with evidence that establishes that he is likely to succeed in demonstrating that the United States has barred him from returning, whether by air, land, or sea.  Thus far, he has not done so.[2]

---

[2] For the same reasons, Omar has not demonstrated likelihood of success on the merits on his violation of customary international law claim, assuming such a claim is cognizable.  While international law prohibits torture and exile, Tel–Oren v. Libyan Arab Republic, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring), cert. denied, 470 U.S. 1003 (1985); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 186 (1963), Omar has not alleged sufficient facts to infer that the United States is either exiling him or currently facilitating his torture.  Nor is it clear that this Court has statutory jurisdiction to hear such a customary international law cause of action, and Omar has not provided such a basis.  See Cisco Sys., Inc. v. Doe, No. 24-856, 2026 WL 1791225, at *4-5 (U.S. June 23, 2026) (holding that the Alien Tort Statute provides federal courts jurisdiction to hear only three, specific causes of action under international common law).

9

As this Court explained when assessing his habeas claim, Omar has not yet presented evidence supporting the inference that the United States—not Turkey—directs his ongoing detention, and thus prevents his return.  And independent of his detention, Omar has offered only evidence that the United States will not permit him to fly through its airspace, not that it would refuse him entry at a land or sea border.  Omar has therefore not shown that he is likely to succeed on the merits of his substantive due process claim.

### E.  Convention Against Torture and International Covenant on Civil Political Rights Claims

Finally, Omar briefly alleges violations of the Convention Against Torture and International Covenant on Civil and Political Rights.  TRO Mot. ¶¶ 26–29.  Yet Omar cites no particular provisions of these treaties that would entitle him to the relief he seeks.

The Convention Against Torture, for example, primarily protects an individual from being expelled, returned, or extradited to a state "where there are substantial grounds for believing that he would be in danger of being subjected to torture."  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3(1), Dec. 10, 1984, S. Treaty Doc. No.100-20 (1988), 1465 U.N.T.S. 85; see also Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin, 174 F.4th 81, 95 (D.C. Cir. 2026) ("[T]he Convention Against Torture . . . bars the removal of individuals to countries where they are likely to be tortured.").  The Convention is therefore inapposite here, where Omar does not request withholding of removal, injunctive relief remedying unlawful removal, or even injunctive relief barring his deportation to Jordan—but instead seeks affirmative aid in returning to the United States, a country he departed voluntarily over two decades ago.

Furthermore, the United States ratified the International Covenant on Civil and Political Rights as non-self-executing.  U.S. Reservations, Declarations and Understandings, International

10

Covenant on Civil and Political Rights, 138 Cong. Rec. 8071 (1992) ("[T]he United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing").  As a result, the Covenant "can only be enforced pursuant to legislation to carry [it] into effect," Medellin v. Texas, 552 U.S. 491, 505 (2008).  To date, Congress has not passed legislation executing the treaty, so it does not vest Omar with rights cognizable in this Court.  Shibeshi v. United States, 920 F. Supp. 2d 105, 107 (D.D.C. 2013).

Omar is therefore unlikely to succeed on the merits of his claims under the Convention Against Torture and International Covenant on Civil and Political Rights.

\*      \*      \*

Omar has failed to show that he is likely to succeed on the merits of any of the claims he presses, precluding entry of the TRO he seeks.  See Kiyemba v. Obama, 561 F.3d 509, 513 (D.C. Cir. 2009) ("If the moving party can show no likelihood of success on the merits, then preliminary relief is obviously improper . . . .").  As a result, the Court only briefly addresses whether he has clearly shown that he will suffer immediate and irreparable injury before the government can be heard in response, or whether he has provided the government with adequate notice of his motion.

## II.    Irreparable Harm

The D.C. Circuit "has set a high standard for irreparable injury." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  An irreparable injury "must be both certain and great." Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985); see also Clevinger v. Advoc. Holdings, Inc., 134 F.4th 1230, 1234 (D.C. Cir. 2025).  Moreover, because certainty of injury is required and preliminary relief is intended to preserve the status quo, "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." Wis. Gas Co., 758 F.2d at 674.

11

Omar contends that emergency relief is appropriate here because he will suffer three immediate and irreparable harms before the government can be heard in opposition. TRO Mot. ¶ 30. First, Omar asserts that Turkey seeks to deport him to Jordan, and he faces a substantial risk of torture there. Id. Second, Omar contends that deportation to Jordan will functionally deprive him of his ability to vindicate his constitutional rights, because Omar alleges that the transfer will remove him from United States custody, mooting his habeas claim. See id. And third, Omar asserts that deportation to Jordan will indefinitely separate him from his American wife and children. Id.

The injuries Omar alleges, should they come to pass, may prove very difficult to remedy. But from the pleadings thus far, the Court is not yet persuaded that they are certain—and is particularly concerned that they are unlikely to directly result from the actions that Omar seeks to enjoin. Omar has not yet alleged facts supporting the inference that the United States has directed Turkey to deport him to Jordan. And as this Court has previously explained, Omar has also not yet demonstrated that the government has barred him from re-entering the United States at its land or sea borders. So the Court cannot say, at this early juncture, that the action Omar seeks to enjoin—the government's alleged refusal to permit him to board an airplane to the United States—is certain to directly cause his deportation to Jordan and that deportation's subsequent harms.[3]

### III. Compliance with Federal Rule of Civil Procedure 65(b) and D.D.C. Local Rule 65.1(a)

Pursuant to Federal Rule of Civil Procedure 65(b), movants seeking a TRO prior to notifying the adverse party must certify their efforts to give notice and explain why it should not

---

[3] The indirect relationship between the relief Omar requests and the harm he seeks to avoid could also present a redressability problem. See Murthy v. Missouri, 603 U.S. 43, 57 (2024) ("[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." (citation modified)).

12

be required.  Fed. R. Civ. P. 65(b)(1); see also D.D.C. Loc. Civ. R. 65.1(a) (requiring either a certificate of counsel or other proof satisfactory to the Court of efforts made by the moving party to provide notice to the adverse party).

Omar's counsel has submitted a declaration listing the steps he took to contact government defendants and citing his lack of success in reaching them in support of why notice should not be required.  The Court has reviewed Omar's counsel's submission and is troubled by the steps that counsel did not take to notify defendants and hence is uncertain whether counsel's steps were reasonable.

Within Omar's habeas petition and subsequent motion for a TRO, Omar's counsel chronicles the many emails he has exchanged with American consular officers in Turkey about Omar's detention.  See, e.g., Pet. ¶¶ 36–38, 40; TRO Mot. ¶ 8, Decl. of C. Doebbler ¶¶ 4–5.  But despite naming the Secretary of State as a defendant in this action, Omar's counsel does not represent that he attempted to contact any of the individuals at the State Department that he had previously communicated with to notify them of the impending TRO motion.  Instead, he called the Department of State's main, public number.  Certificate of Conf. ¶ 5.  When no one answered that number, he emailed secretary@state.gov and a state department employee in the Office of American Citizen Services.  Id. ¶ 6; see also Conf. Email [ECF No. 3-3].  His email was remarkably cryptic, indicating that he sought to file a motion for a TRO but not specifying that the motion pertained to Omar nor clarifying the circumstances of the emergency.  See Conf. Email.

Counsel's efforts to contact the Department of Justice, the Department of Homeland Security, and the FBI were similarly limited, although the pleadings do not themselves indicate that his counsel had direct contact information for officials at those agencies.  See Certificate of Conf.; Conf. Email.

13

Ultimately, the Court rests its denial of Omar's motion for a TRO on his failure to demonstrate that he is likely to succeed on the merits of his claims.  But the Court nevertheless notes that it harbors some doubt as to whether Omar adequately complied with Rule 65(b)'s prerequisites to ex parte relief.

## CONCLUSION

For these reasons, the court DENIES [3] Omar's emergency motion for a Temporary Restraining Order.

SO ORDERED.

/s/
JOHN D. BATES
United States District Judge

Dated: July 2, 2026

14